*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, e-mail corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CLAIRE A. DONAHUE, | ) | |
| | ) | Supreme Court Nos. S-14910/14929 |
| Appellant and | ) | |
| Cross-Appellee, | ) | |
| | ) | Superior Court No. 3AN-10-07305 CI |
| v. | ) | |
| | ) | O P I N I O N |
| LEDGENDS, INC. d/b/a ALASKA | ) | |
| ROCK GYM, | ) | |
| | ) | No. 6932 - August 1, 2014 |
| Appellee and | ) | |
| Cross-Appellant. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Christine S. Schleuss, Law Office of Christine S. Schleuss, Anchorage, for Appellant and Cross-Appellee. Tracey L. Knutson, Girdwood, for Appellee and Cross-Appellant.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

MAASSEN, Justice.

I.    INTRODUCTION

This case arises from an injury at a climbing gym. Claire Donahue broke her tibia during a class at the Alaska Rock Gym after she dropped approximately three to four-and-a-half feet from a bouldering wall onto the floor mat. Before class Donahue

had been required to read and sign a document that purported to release the Rock Gym from any liability for participants' injuries.

Donahue brought claims against the Rock Gym for negligence and violations of the Uniform Trade Practices and Consumer Protection Act (UTPA). The Rock Gym moved for summary judgment, contending that the release bars Donahue's negligence claim. It also moved to dismiss the UTPA claims on grounds that the act does not apply to personal injury claims and that Donahue failed to state a prima facie case for relief under the act. Donahue cross-moved for partial summary judgment on the enforceability of the release as well as the merits of her UTPA claims. The superior court granted the Rock Gym's motion and denied Donahue's, then awarded attorney's fees to the Rock Gym under Alaska Civil Rule 82.

Donahue appeals the grant of summary judgment to the Rock Gym; the Rock Gym also appeals, contending that the superior court should have awarded fees under Alaska Civil Rule 68 instead of Rule 82. We affirm the superior court on all issues.

## II.    FACTS AND PROCEEDINGS

Ledgends, Inc. does business as the Alaska Rock Gym, a private indoor facility that is open to the public. Its interior walls have fixed climbing holds and routes; for a fee, it provides classes and open gym or free climbing time. There are signs posted around the Rock Gym warning of the dangers of climbing, including falling; at her deposition Donahue did not dispute that the signs were there when she visited the gym.

Donahue had been thinking about trying rock climbing for several years, and she finally decided in March 2008 to attend a class at the Rock Gym called "Rockin' Women." She testified that she chose the class because she thought it could be tailored to specific skill levels, and because she "got the impression [from the advertisements]

that that is the type of group it was, that it was a . . . safe way to learn to climb." She also testified she understood that the essential risk of climbing is falling.

Donahue had no rock climbing experience, but she was an occasional runner and cyclist and had pursued other high-risk athletic activities such as kite-boarding. She had been a river guide on the Colorado River after college. She had engaged in physical occupations such as commercial fishing and construction. She testified that she understood the nature of risky activities and felt competent to decide about them for herself. In connection with other recreational activities, she had signed releases and waivers similar to the one she signed at the Rock Gym. She testified that she understood that parties who sign contracts generally intend to be bound by them.

When Donahue arrived at the Rock Gym for her first class, she was given a document entitled "Participant Release of Liability, Waiver of Claims, Assumption of Risks, and Indemnity Agreement — Alaska Rock Gym." She was aware of the document's nature and general intent but testified that although she signed it voluntarily, she did not read it closely.

The release contains nine numbered sections on two single-spaced pages. There is also an unnumbered introductory paragraph; it defines the Rock Gym to include, among others, its agents, owners, participants, and employees, as well as "all other persons or entities acting in any capacity on its behalf."

Section one of the release contains three paragraphs. The first recites the general risks of rock climbing, including injury and death, and explains that these risks are essential to the sport and therefore cannot be eliminated. The second paragraph lists about a dozen specific risks inherent in rock climbing, including "falling off the climbing wall," "impacting the ground," "the negligence of other[s]," and "my own negligence[,] inexperience, . . . or fatigue." The third paragraph asserts that the gym and its instructors

"seek safety, but they are not infallible." It describes some errors instructors might make, including being ignorant of a participant's abilities and failing to give adequate warnings or instructions. The final sentence in the third paragraph reads, "By signing this [release], I acknowledge that **I AM ULTIMATELY RESPONSIBLE** for my own safety during my use of or participation in [Rock Gym] facilities, equipment, rentals, or activities."

Section two begins, "I expressly agree and promise to accept and assume all the risks . . ."; it then highlights the voluntary nature of participation in Rock Gym activities.

Section three is the clause that releases the Rock Gym from liability (the releasing clause). It reads in full,

> I hereby voluntarily release, forever discharge, and agree to indemnify and hold harmless the [Rock Gym] from any and all claims, demands, or causes of action, which are in any way connected with my participation in these activities or my use of [the Rock Gym's] equipment, rentals or facilities, including any such claims which allege negligent acts or omissions of [the Rock Gym].

The next six sections of the release address other issues: indemnification for attorney's fees, certification that the participant is fit to climb, permission to provide first aid, permission to photograph for promotional purposes, the voluntariness of participation and signing the release, and jurisdiction for claims arising from the release.

The ultimate paragraph is printed in bold. It reads in part,

> **By signing this document, I acknowledge that if anyone is hurt or killed or property is damaged during my participation in or use of [Rock Gym] activities or premises or facilities or rental equipment, I may be found by a court of law to have waived my right to maintain a**

**lawsuit against [the Rock Gym] on the basis of any claim from which I have released them herein.**

Finally, centered on the second page, in bold capital letters directly above the signature line, the release reads: **"I HAVE HAD SUFFICIENT OPPORTUNITY TO READ THIS ENTIRE DOCUMENT. I HAVE READ AND UNDERSTOOD IT, AND I AGREE TO BE BOUND BY ITS TERMS."**

Donahue's hand-printed name and the date appear on the first page of the release, and her initials are at the bottom of the page; her signature appears on the second page, along with her printed name, her contact information, and the date.

Donahue completed her first class on harnessed climbing on March 23, 2008, and returned for a second class on May 11. When class began she was told that the day's focus would be on bouldering, or unharnessed climbing on low walls. She did not express any hesitation. She climbed for almost two hours, successfully ascending and descending a number of routes. During this time she saw other people drop from the wall without injury. After another successful ascent near the end of the lesson, she felt unable to climb down using the available holds. Her feet were somewhere between three and four-and-a-half feet from the ground. Her instructor suggested that she drop to the mat and told her to be sure to bend her knees. Donahue landed awkwardly and broke her tibia in four places. She was attended to immediately by Rock Gym personnel and a physician who happened to be present.

The Rock Gym had run various advertisements during the two years preceding Donahue's accident, using a number of different slogans. One newspaper ad, running on at least three occasions, stated: "[T]the only safe place in town to hang out." Another Rock Gym ad showed an adult bouldering and a child climbing while harnessed; its text contained the same slogan and added, in part, "Trust us, it still exists. . . . [E]very

child in your family will be reminded of what it's all about — friends and fun." A third ad described climbing programs for everyone in the family and said, "[Y]ou have nothing to lose and everything to gain." In an affidavit, Donahue testified she had read these ads.

Donahue sued the Rock Gym for negligent failure to adequately train and supervise its instructors. She alleged that the Rock Gym was liable for its employee's negligent instruction to drop from the bouldering wall. She also alleged a violation of the Unfair Trade Practices and Consumer Protection Act, contending that the Rock Gym's advertisements "misleadingly advertised [the gym] as a safe place where users of its services had nothing to lose and everything to gain."

The Rock Gym moved for summary judgment on all of Donahue's claims. She opposed the motion and cross-moved for partial summary judgment herself, arguing that the Rock Gym had violated the UTPA as a matter of law and that the release she had signed was null and void.

The superior court granted the Rock Gym's motion and denied Donahue's cross-motion. It then granted the Rock Gym, as prevailing party, partial attorney's fees under Civil Rule 82(a)(3).

## III.    STANDARDS OF REVIEW

We review grants of summary judgment de novo, determining whether the record presents any genuine issues of material fact.[1] In making this determination, we construe the facts in favor of the non-moving party.[2] If the record fails to reveal a

---

[1]    *Hill v. Giani*, 296 P.3d 14, 20 (Alaska 2013) (citing *Yost v. State, Div. of Corps., Bus. & Prof'l Licensing*, 234 P.3d 1264, 1272 (Alaska 2010)).

[2]    *Id.* (citing *McCormick v. City of Dillingham*, 16 P.3d 735, 738 (Alaska (continued...)

genuine factual dispute and the moving party was entitled to judgment as a matter of law, the trial court's grant of summary judgment must be affirmed.[3]

We decide questions of law, including statutory interpretation, using our independent judgment.[4]  We will adopt the most persuasive rule of law in light of precedent, reason, and policy.[5]  This requires us, when interpreting statutes, to "look to the meaning of the language, the legislative history, and the purpose of the statute."[6]

"A superior court's determination whether waiver occurred is a question of fact that we review for clear error."[7]

---

[2](...continued)
2001)).

[3]     *Kelly v. Muncipality of Anchorage*, 270 P.3d 801, 803 (Alaska 2012).

[4]     *Therchik v. Grant Aviation, Inc.*, 74 P.3d 191, 193 (Alaska 2003).

[5]     *ASRC Energy Servs. Power & Commc'ns, LLC v. Golden Valley Electric Ass'n*, 267 P.3d 1151, 1157 (Alaska 2011).

[6]     *Id.*

[7]     *Sengul v. CMS Franklin, Inc.*, 265 P.3d 320, 324 (Alaska 2011).

## IV.  DISCUSSION

### A.  The Release Is Enforceable And Bars Donahue's Negligence Claims.

Three cases define Alaska law on pre-activity releases from liability.[8] These cases consistently state that such releases are not per se invalid;[9] in each of the cases, however, we concluded that the release at issue did not bar the plaintiff's claim.

*Kissick v. Schmierer* involved a plane crash that caused the deaths of all four people aboard.[10] The three passengers had signed a covenant not to sue before they boarded the plane.[11] They agreed in the release not to bring a claim "for any loss, damage, or injury to [their] person or [their] property which may occur from any cause whatsoever."[12] When the passengers' surviving spouses filed wrongful death claims

---

[8] *Ledgends, Inc. v. Kerr*, 91 P.3d 960 (Alaska 2004); *Moore v. Hartley Motors*, *Inc.*, 36 P.3d 628 (Alaska 2001); *Kissick v. Schmierer*, 816 P.2d 188 (Alaska 1991).

[9] *Kerr*, 91 P.3d at 961-62 (noting that "under Alaska law pre-recreational exculpatory releases are held to a very high standard of clarity"); *Moore*, 36 P.3d at 631 (noting that "an *otherwise valid* release is ineffective when releasing a defendant from liability would violate public policy" (emphasis added)); *Kissick*, 816 P.2d at 191 ("A promise not to sue for future damage caused by simple negligence may be valid." (quoting 15 SAMUEL WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 1750A, at 143-45 (3d ed. 1972)); *see also Mitchell v. Mitchell*, 655 P.2d 748, 751 (Alaska 1982) (upholding provision not to sue in settlement agreement and noting that, "[a]s a matter of law, . . . a valid release of all claims will bar any subsequent claims covered by the release").

[10] *Kissick*, 816 P.2d at 188.

[11] *Id.* at 189.

[12] *Id.*

against the pilot, their claims were allowed to proceed despite the release.[13] We ruled that "[i]ntent to release a party from liability for future negligence must be conspicuously and unequivocally expressed."[14] We also held that a release must use the word "negligence" to establish the required degree of clarity, something the release in *Kissick* did not do.[15] Further, since liability for "death" was not specifically disclaimed and the term "injury" was ambiguous, we held that the release did not apply to claims for wrongful death, construing it against the drafter.[16]

The second case, *Moore v. Hartley Motors*, involved an injury during a class on driving all-terrain vehicles (ATVs).[17] We first addressed whether the plaintiff's signed release violated public policy.[18] We noted that the type of service involved was neither essential nor regulated by statute;[19] these factors, along with the voluntariness of the plaintiff's participation, persuaded us that the defendants[20] had no "decisive

---

[13] *Id.*

[14] *Id.* at 191 (citations omitted).

[15] *Id.* (citing W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 68, at 483-84 (5th ed.1984) (footnotes omitted)).

[16] *Id.* at 191-92.

[17] 36 P.3d 628, 629 (Alaska 2001).

[18] *Id.* at 631-32.

[19] *Id.* at 631-32 (noting that ATV riding is similar to parachuting, dirt biking, and scuba diving, for which releases have been upheld in other jurisdictions).

[20] The defendants included the dealer that sold the plaintiff the ATV and referred her to the safety course, the ATV Safety Institute that developed the curriculum, and the individual instructor. *Id.* at 629.

advantage in bargaining strength."[21] We therefore held that the release did not violate public policy.[22]

We did decide, however, that the release did not conspicuously and unequivocally express an intent to release the defendants from liability for the cause of the exact injury that occurred — a rollover when the plaintiff drove over a big rock hidden in tall grass.[23] The release covered the inherent risks of ATV riding, but we found that it also included "an implied and reasonable presumption that the course [was] not unreasonably dangerous."[24] We found there to be fact questions about whether "the course posed a risk beyond ordinary negligence related to the inherent risks of off-road ATV riding assumed by the release," and we held that summary judgment for the defendants on the basis of the release was therefore improper.[25]

The third case, *Ledgends, Inc. v. Kerr*, involved the same rock gym as this case.[26] It involved a similar injury as well, sustained when the plaintiff fell from a bouldering wall.[27] Unlike Donahue, however, who landed squarely on the floor mat, the plaintiff in *Kerr* was allegedly injured when her foot slipped through the space between

---

[21]   *Id.* at 631-32.

[22]   *Id.*

[23]   *Id.* at 632.

[24]   *Id.*

[25]   *Id.* at 633-34.

[26]   91 P.3d 960 (Alaska 2004).

[27]   *Id.* at 961.

two floor mats.[28] The plaintiff alleged the gym knew of the defect in the landing area but had failed to fix it.[29]

The superior court, whose order we approved and attached as an appendix to our opinion, cited *Kissick* for the notion that a pre-activity release for tortious conduct must be "clear, explicit, and comprehensible in each of its essential details."[30] The superior court also noted the requirement that "such an agreement, read as a whole, must clearly notify the prospective releasor or indemnitor of the effect of signing the release."[31] With these principles in mind, the superior court pointed to language in the release that was problematic because it was internally inconsistent: the release stated that the gym would try to keep its facilities safe and its equipment in good condition, but it simultaneously disclaimed liability for actions that failed to meet such standards.[32] The superior court construed this ambiguity against the drafter and held that the release was not valid as a bar to the plaintiff's negligence claims, a holding we affirmed.[33]

In this case, the superior court concluded that *Kissick*, *Moore*, and *Kerr*, considered together, meant that "an effective liability release requires six characteristics." We agree with the superior court's formulation of the list:

---

[28] *Id.*

[29] *Id.*

[30] *Id.* at 961-62 (quoting *Kissick v. Schmierer*, 816 P.2d 188, 191 (Alaska 1991)) (internal quotation marks omitted).

[31] *Id.* at 962 (quoting *Kissick*, 816 P.2d at 191) (internal quotation marks omitted).

[32] *Id.* at 963.

[33] *Id.*

(1) the risk being waived must be specifically and clearly set forth (*e.g.* death, bodily injury, and property damage); (2) a waiver of negligence must be specifically set forth using the word "negligence"; (3) these factors must be brought home to the releasor in clear, emphasized language by using simple words and capital letters; (4) the release must not violate public policy; (5) if a release seeks to exculpate a defendant from liability for acts of negligence unrelated to inherent risks, the release must suggest an intent to do so; and (6) the release agreement must not represent or insinuate standards of safety or maintenance.

The superior court found that each of these characteristics was satisfied in this case, and again we agree.[34]

---

[34]     Donahue does not challenge the release on public policy grounds, so the fourth characteristic of a valid release is satisfied here.  Alaska recognizes that recreational releases from liability for negligence are not void as a matter of public policy, because to hold otherwise would impose unreasonable burdens on businesses whose patrons want to engage in high-risk physical activities. *Kissick*, 816 P.2d at 191 ("A promise not to sue for future damage caused by simple negligence may be valid." (internal citations and quotation marks omitted)).  The New Jersey Supreme Court, in a case involving claims against a health club, held that liability releases in gym cases do not violate public policy in part because gyms remain liable for their gross negligence or recklessness — levels of culpability not alleged in this case. *Stelluti v. Casapenn Enters.*, 1 A.3d 678, 681 (N.J. 2010); *see also City of Santa Barbara v. Super. Ct.*, 161 P.3d 1095, 1102-03 (Cal. 2007) (surveying jurisdictions and concluding that "[m]ost, but not all" hold that releases of ordinary negligence in recreational activities do not violate public policy but "the vast majority of decisions state or hold that such agreements generally are void" if they attempt to release "aggravated misconduct" such as gross negligence).

**1.    The risks being waived (falling and instructor negligence) are specifically and clearly set forth.**

A conspicuous and unequivocal statement of the risk waived is the keystone of a valid release.[35]  Here, the release clearly and repeatedly disclosed the risk of the specific injury at issue:  injury from falling while climbing.  The following are excerpts from the Rock Gym's release:

> I specifically acknowledge that the inherent risks associated with rock climbing . . . include[], but [are] not limited to: falling off of the climbing wall, . . . impacting the ground . . . , general slips/trips/falls or painful crashes while using any of the equipment or walls or bouldering areas or landing pits or work-out areas or the climbing structures or the premises at large, climbing out of control or beyond my or another participant's limits, . . . my own negligence or inexperience, dehydration or exhaustion or cramps or fatigue
> . . . .

To the extent that the risk at issue is the risk of hitting the ground after falling (or dropping in what is essentially an intentional fall), the first characteristic of a valid release is satisfied by this language.

Rather than focusing on her injury, however, Donahue focuses on its alleged cause, which she argues was the negligent training and supervision of Rock Gym instructors and the consequently negligent instructions she was given.  She claims that the release did not specifically and clearly set forth this risk, and that she was therefore unaware that she was waiving the right to sue for instructor negligence.

But the release did cover this risk.  The first paragraph expressly incorporates "employees" into the definition of the entity being released.  The release further warns that Rock Gym "instructors, employees, volunteers, agents or others . . .

---

[35]    *Kerr*, 91 P.3d at 961; *Moore v. Hartley Motors, Inc.*, 36 P.3d 628, 632 (Alaska 2001);  *Kissick*, 816 P.2d at 191.

are not infallible" and that "[t]hey may give inadequate warnings or instructions." In its on-site interactions with the public, the Rock Gym necessarily acts through its instructors and other employees; Donahue knew she would be taking a class and that classes require instructors. It would not be reasonable to conclude that the Rock Gym sought a release only of those claims against it that did not involve the acts or omissions of any of its employees, and we cannot construe the release in that way.[36] We agree with the superior court's conclusion that "the Release clearly expresses that it is a release of liability for the negligence of the releasor-participant, other participants, climbers, spotters or visitors, as well as [the Rock Gym's] negligence, including [Rock Gym] employees."

Donahue also argues that she could not understand the risks involved due to the release's appearance and presentation. However, even viewing the facts in the light most favorable to her, the record does not support her argument. Although Donahue did not carefully read the release before signing it,[37] she was aware she was signing a liability release. She has signed a number of such documents in the past and was familiar with their general purpose. When asked to read the release at her deposition, she testified that she understood the pertinent risks it described. There is no reason to believe that she would have found it less comprehensible had she read it at the time she signed it.

---

[36] *See Kahn v. E. Side Union High Sch. Dist.*, 75 P.3d 30, 40 (Cal. 2003) (holding that "the risks associated with *learning* a sport may themselves be inherent risks of the sport. . . . [A]nd . . . liability should not be imposed simply because an instructor asked the student to take action beyond what, with hindsight, is found to have been the student's abilities" (internal citations and quotation marks omitted)).

[37] Failure to read a contract in detail before signing it is no defense to its enforceability. *Lauvetz v. Alaska Sales & Serv.*, 828 P.2d 162, 164-65 (Alaska 1991).

## 2. The waiver of negligence is specifically set forth using the word "negligence."

*Kissick* and *Kerr* both emphasize that a valid release from liability for negligence claims requires use of the word "negligence."[38] This requirement is met here.

The Rock Gym's release first lists negligence among the inherent risks of climbing ("the negligence of other climbers or spotters or visitors or participants" and "my own negligence"). It then provides: "I hereby voluntarily release, forever discharge, and agree to indemnify and hold harmless the [Rock Gym] from *any and all claims*, demands, or causes of action, . . . including any such claims which allege negligent acts or omissions of [the Rock Gym]." (Emphasis added.) The phrase "any and all claims" is thus expressly defined to include claims for negligence.

Cases from other jurisdictions support the conclusion that the language in the Rock Gym's release covers all of Donahue's negligence claims. In *Rosencrans v. Dover Images, Ltd.*, the plaintiff was injured on a motocross track after falling from his bike and being struck by two other riders.[39] A California Court of Appeal concluded that the signed waiver releasing the track from liability for "any losses or damages . . . whether caused by the negligence of [the Releasees] or otherwise" precluded the plaintiff's claim "for ordinary negligence as well as negligent hiring and supervision" of employees at the racetrack (though it did not release the track from liability for gross negligence — a claim not made here).[40]

---

[38] *Kerr*, 91 P.3d at 961; *Kissick*, 816 P.2d at 191.

[39] 122 Cal. Rptr. 3d 22, 27 (Cal. App. 2011).

[40] *Id.* at 30. *See also Morris v. JTM Materials, Inc.*, 78 S.W.3d 28, 49 (Tex. App. 2002) ("Negligent hiring, retention, and supervision claims are all simple negligence causes of action based on an employer's direct negligence rather than on

(continued...)

In short, the requirement that a waiver of negligence be specifically set out using the word "negligence" is satisfied by the Rock Gym's release.

3. **The important factors are brought home to the releasor in clear, emphasized language with simple words and capital letters.**

Donahue argues that although "negligence" is expressly mentioned and disclaimed in the release, its placement at the end of long sentences written in small font rendered its presence meaningless to her. Quoting a California case, she argues that when the risk of negligence is shifted, a layperson "should not be required to muddle through complex language to know that valuable, legal rights are being relinquished."[41] Donahue also cites New Hampshire and Washington cases in which the structure and organization of releases obscured the language that purported to shield the defendants from claims.[42] These cases considered factors such as "whether the waiver is set apart or hidden within other provisions, whether the heading is clear, [and] whether the waiver is set off in capital letters or in bold type."[43] In one Washington case, a release was invalidated because the releasing language was in the middle of a paragraph.[44]

Fundamentally, Donahue argues that the Rock Gym's release was so ambiguous and laden with legalese that she lacked any real ability to understand that she

---

[40](...continued)
vicarious liability." (citations omitted)).

[41]    *Conservatorship of the Estate of Link v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 205 Cal. Rptr. 513, 515 (Cal. App. 1984).

[42]    *See Wright v. Loon Mtn. Recreation Corp.*,  663 A.2d 1340, 1342 (N.H. 1995); *Johnson v. UBAR, LLC*, 210 P.3d 1021, 1023 (Wash. App. 2009).

[43]    *Johnson*, 210 P.3d at 1023 (citing *Baker v. City of Seattle*, 484 P.2d 405 (Wash. 1971)).

[44]    *Baker,* 484 P.2d at 407.

was agreeing to release the Rock Gym from the negligence of its instructors. She complains of the release's "lengthy, small-printed, and convoluted" language which required a "magnifying glass and lexicon" to decipher. She points out that the clause purporting to release the Rock Gym from liability is not obvious or emphasized through bold print or capital letters. She testified at her deposition that she believed the waiver shielded the gym only "from frivolous lawsuits, from people blaming them for something that's not their fault."

It is true that the release's text is small and the releasing clause is in the middle of the document toward the bottom of the first page. But the clauses addressing negligence do not appear to be "calculated to conceal," as Donahue argues. Though not highlighted, they are in a logical place where they cannot be missed by someone who reads the release. The clause releasing the Rock Gym from liability is a single sentence set out as its own numbered paragraph, and it is not confusing or needlessly wordy.[45] The inherent risks of climbing are enumerated in great detail but using ordinary descriptive language that is easy to understand.[46] Several sentences are devoted to the

---

[45] Paragraph 3 of the release reads: "I hereby voluntarily release, forever discharge, and agree to indemnify and hold harmless the [Rock Gym] from any and all claims, demands, or causes of action, which are in any way connected with my participation in these activities or my use of [the Rock Gym's] equipment, rentals or facilities, including any such claims which allege negligent acts or omissions of [the Rock Gym]."

[46] Paragraph 1 of the release lists the inherent risks of climbing as including "but . . . not limited to":

> falling off of the climbing wall, being fallen on or impacted by other participants, poor or improper belaying, the possibility that I will be jolted or jarred or bounced or thrown to and fro or shaken about while climbing or belaying, entanglement in ropes, impacting the ground and/or climbing

(continued...)

role of the gym's "instructors, employees, volunteers, agents or others," stating that they "have difficult jobs to perform," that they "seek safety, but they are not infallible," and that they may "be ignorant of mine or another participant's fitness or abilities" and "may give inadequate warnings or instructions."

Because releases should be read "as a whole" in order to decide whether they "clearly notify the prospective releasor or indemnitor of the effect of signing the agreement,"[47] we consider these provisions in the context of the entire document. Three other sections of emphasized text mitigate Donahue's complaints about ambiguity and incomprehensibility. First, section one reads in part, "**I AM ULTIMATELY RESPONSIBLE** for my own safety during my use of or participation in [Rock Gym] facilities, equipment, rentals or activities" (bold in original). This alone makes it clear to the reader that the Rock Gym, to the extent it is allowed to do so, intends to shift

---

[46](...continued)

> wall, loose or dropped or damaged ropes or holds, equipment failure, improperly maintained equipment which I may or may not be renting from [the Rock Gym], displaced pads or safety equipment, belay or anchor or harness failure, general slips/trips/falls or painful crashes while using any of the equipment or walls or bouldering areas or landing pits or work-out areas or the climbing structures or the premises at large, climbing out of control or beyond my or another participant['s] limits, the negligence of other climbers or spotters or visitors or participants who may be present, participants giving or following inappropriate "Beta" or climbing advice or move sequences, mine or others' failure to follow the rules of the [Rock Gym], my own negligence or inexperience, dehydration or exhaustion or cramps or fatigue — some or all of which may diminish my or the other participants' ability to react or respond.

[47] *Kissick v. Schmierer*, 816 P.2d 188, 191 (Alaska 1991).

responsibility to the climber regardless of the actions of anyone else. Second, a final unnumbered paragraph, set out in bold letters, reads in part: "**By signing this document, I acknowledge that if anyone is hurt or killed or property is damaged during my participation in or use of [Rock Gym] activities or premises or facilities or rental equipment, I may be found by a court of law to have waived my right to maintain a lawsuit against [the Rock Gym] on the basis of any claim from which I have released them herein.**" And finally, directly above the lines where Donahue entered her signature, her printed name, her contact information, and the date, the release reads, in bold and capital letters, "**I HAVE READ AND UNDERSTOOD [THE RELEASE], AND I AGREE TO BE BOUND BY ITS TERMS.**" If Donahue had read the release and found herself genuinely confused about any of its terms, she was prominently notified that she should inquire about it before signing.

The New Hampshire case on which Donahue relies, *Wright v. Loon Mountain Recreation Corp.*, examined the release in question to determine whether "a reasonable person in the position of the plaintiff would have understood that the agreement clearly and specifically indicated the intent to release the defendant from liability for its own negligence."[48] Applying that test here, we conclude that a reasonable person in Donahue's position could not have overlooked or misunderstood the release's intent to disclaim liability. Our case law's third characteristic of a valid release is therefore satisfied.

---

[48] 663 A.2d 1340, 1343-44 (N.H. 1995); *see also Johnson*, 210 P.3d at 1021 (holding reasonable persons could disagree about the conspicuousness of the release provision in the waiver, and remanding for trial).

4. **Regardless of whether falling and instructor negligence are inherent risks of rock climbing, the release specifically disclaims liability for them.**

The fifth characteristic set forth by the superior court[49] is that "if a release seeks to exculpate a defendant from liability for acts of negligence unrelated to inherent risks, the release must suggest an intent to do so."[50] This requirement stems from the release's ill-defined scope in *Moore*; the injury that occurred — arguably caused by an unreasonably dangerous ATV training course — was not obviously included in the inherent risks of riding ATVs, which the signed release did intend to cover.[51] Here, in contrast, the injury and its alleged causes are all expressly covered by the release, as explained above. Negligence claims are specifically contemplated, as are "falls," "impact" with the ground, and "inadequate warnings or instructions" from Rock Gym instructors. Regardless of whether these are inherent risks of climbing, they are specifically covered by the release. This characteristic of a valid release is therefore satisfied.

5. **The release does not represent or imply standards of safety or maintenance that conflict with an intent to release negligence claims.**

The sixth characteristic of a valid release is that it does not imply standards of safety or maintenance that conflict with an intent to waive claims for negligence.[52] The Rock Gym argues that nothing in the release confuses its purpose, unlike the release at

---

[49] As noted above, the fourth characteristic of a valid release — that it not violate public policy — is not at issue on this appeal. *See supra* note 34.

[50] *See Moore v. Hartley Motors, Inc.*, 36 P.3d 628, 633-34 (Alaska 2001).

[51] *Id.*

[52] *See Ledgends, Inc. v. Kerr*, 91 P.3d 960, 962-63 (Alaska 2004).

issue in *Kerr*, which at least implicitly promised that equipment would be kept "in good condition."[53] We agree. In fact, far from providing assurances of safety, the release highlights the fallibility of the Rock Gym's employees, equipment, and facilities, explicitly stating that the equipment may "fail," "malfunction[,] or be poorly maintained" and that the staff is "not infallible," may be ignorant of a climber's "fitness or abilities," and "may give inadequate warnings or instructions."

Donahue agrees that the release is not internally inconsistent, but she argues that the advertisements run by the Rock Gym had the same confounding impact on her understanding of it as the release's language about equipment maintenance had in *Kerr*. She contends that she relied on the ads' assurances that the gym was "a safe place" and the class "would be a safe way to learn to climb" when she enrolled in the climbing class. She argues that these assurances created ambiguity that, as in *Kerr*, requires that the release be interpreted in a less exculpatory way.

Although extrinsic evidence may be admissible as an aid to contract interpretation,[54] the release here clearly defines climbing as an inherently risky activity. And we have said that

> where one section deals with a subject in general terms and another deals with a part of the same subject in a more detailed way, the two should be harmonized if possible; but if there is a conflict, the specific section will control over the general.[55]

---

[53] *Id.* at 963.

[54] *Norville v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1004 (Alaska 2004) (citing *Municipality of Anchorage v. Gentile*, 922 P.2d 248, 256 (Alaska 1996)).

[55] *Id.* (quoting *Estate of Hutchinson*, 577 P.2d 1074, 1075 (Alaska 1978)).

Were we to give the Rock Gym's advertisements any weight in our analysis of the release, we would not find that their use of the word "safe" overrode the release's very clear warnings about the specific risks of climbing.

Because the advertisements cannot reasonably be considered as modifications to the release, and because the release does not otherwise contain implicit guarantees of safety or maintenance that could confuse its purpose, we find the final requirement of a valid release to be satisfied. The release thus satisfies all characteristics of a valid release identified by our case law, and we affirm the superior court's grant of summary judgment to the Rock Gym on this issue.

**B.      The UTPA Does Not Apply To Personal Injury Claims.**

Under the UTPA, "[a] person who suffers an ascertainable *loss of money or property* as a result of another person's act or practice declared unlawful by AS 45.50.471 may bring a civil action to recover for each unlawful act or practice three times the actual damages . . . ."[56] Donahue alleges that, by publishing ads that gave the impression the Rock Gym was safe, the Rock Gym engaged in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce" which are unlawful under the statute.[57] We have not yet decided whether the statutory phrase "loss of money or property" includes personal injury claims. We now hold that it does not.

The UTPA was "designed to meet the increasing need in Alaska for the protection of consumers as well as honest businessmen from the depredations of those persons employing unfair or deceptive trade practices."[58] The act protects the consumer

---

[56]      AS 45.50.531(a) (emphasis added).

[57]      AS 45.50.471(a).

[58]      *W. Star Trucks, Inc. v. Big Iron Equip. Servs., Inc.*, 101 P.3d 1047, 1052
(continued...)

from deceptive sales and advertising practices,[59] and it protects honest businesses from their unethical competitors.[60] Donahue concedes that we have limited the UTPA to "regulating practices relating to transactions involving consumer goods and services."[61] She contends, however, that because we have never restricted the types of *damages* available for conduct within the UTPA's reach, damages for personal injury should be recoverable.

The superior court observed that there is nothing in the UTPA's legislative history to support Donahue's contention that the Alaska Legislature intended the act "to expand liability for personal injury or wrongful death or to supplant negligence as the basis for such liability." The superior court identified "significant incongruities between

---

[58](...continued) (Alaska 2004) (quoting House Judiciary Committee Report on HCSCS for S.B. 352, House Journal Supp. No. 10 at 1, 1970 House Journal 744) (court's emphasis and internal quotation marks omitted).

[59] *See, e.g.*, *Kenai Chrysler Ctr., Inc. v. Denison*, 167 P.3d 1240, 1244-45 (Alaska 2007) (affirming superior court's award of treble damages against a car dealer for its insistence on enforcing an invalid contract); *Pierce v. Catalina Yachts, Inc.*, 2 P.3d 618, 624 (Alaska 2000) (holding unconscionable sailboat manufacturer's warranty in favor of buyers).

[60] *See, e.g.*, *Garrison v. Dixon*, 19 P.3d 1229, 1230-31, 1236 (Alaska 2001) (holding suit to be frivolous where real estate buyer's agents sued competitors, alleging false and misleading advertising); *Odom v. Fairbanks Mem'l Hosp.*, 999 P.2d 123, 127, 131-32 (Alaska 2000) (holding viable physician's claims against hospital for retaliatory and anticompetitive behavior).

[61] *See Roberson v. Southwood Manor Assocs., LLC*, 249 P.3d 1059, 1062 (Alaska 2011) (holding the UTPA does not apply to residential leases) (citing *Aloha Lumber Corp. v. Univ. of Alaska*, 994 P.2d 991, 1002 (Alaska 1999) (holding the UTPA does not apply to the sale of standing timber because it is real property rather than a consumer good)).

the elements of common law personal injury claims and the UTPA, which suggest that the two claims cannot be reconciled." The court explained:

> For most of the past twenty years the Alaska Legislature has enacted and amended, in various forms, multiple iterations of tort reform aimed at reducing, not expanding, the scope of civil liability for personal injury and wrongful death. Expanding UTPA liability to personal injury and wrongful death would contradict many of the tort reform provisions enacted by the legislature in AS 09.17.010-080. For example, AS 09.17.020 allows punitive damages only if the plaintiff proves defendant's conduct was outrageous, including acts done with malice or bad motives, or with reckless indifference to the interest of another person. The UTPA, on the other hand, does not require such a culpable mental state and almost as a matter of course allows a person to receive trebled actual damages. AS 09.17.060 limits a claimant's recovery by the amount attributable to the claimant's contributory fault; the UTPA, in contrast, does not provide a contributory fault defense. Moreover, AS 09.17.080 apportions damages between multiple tortfeasors whereas the UTPA does not permit apportionment of damages. A UTPA cause of action for personal injury or wrongful death would sidestep all of these civil damages protections.

We agree with the superior court that the private cause of action available under the UTPA conflicts in too many ways with the traditional claim for personal injury or wrongful death for us to assume, without clear legislative direction, that the legislature intended the act to provide an alternative vehicle for such suits. The language of AS 45.50.531(a) — "ascertainable loss of money or property" — does not provide that clear direction. The legislature is well aware of how to identify causes of action involving

personal injury and wrongful death, does so in other contexts,[62] and declined to do so in this statute.

Other states have similar laws, and their courts' interpretations are helpful. Section 531(a) has a counterpart in Oregon's UTPA, which likewise allows private actions by those who suffer a "loss of money or property."[63]  The Oregon Court of Appeals, considering an action for personal injuries occurring after a mechanic allegedly misrepresented the state of a car's brakes, held that the UTPA was not a vehicle for the pursuit of personal injury claims.[64]  It held that the Act plainly had a restitutionary purpose — "i.e., restitution for economic loss suffered by a consumer as the result of a deceptive trade practice."[65]  It noted the lack of any legislative history "to the effect that by the adoption of that provision the legislature intended to confer upon private individuals a new cause of action for personal injuries, including punitive damages and attorney fees," or of "any decisions to that effect by the courts of any of the many other states which have adopted similar statutes."[66]  It emphasized the availability of common law remedies, which provided a range of possible causes of action for personal injury —

---

[62]      *See, e.g.*, AS 04.21.020(e) (for purposes of statute governing civil liability of persons providing alcoholic beverages, " 'civil damages' includes damages for personal injury, death, or injury to property of a person"); AS 05.45.200(4) (in statutes governing liability of ski resorts, "'injury' means property damage, personal injury, or death"); AS 09.10.070(a) (providing general statute of limitations for "personal injury or death");  AS 09.17.010 (limiting noneconomic damages recoverable "for personal injury or wrongful death"); AS 46.03.825(b)(1) (providing that limitations on oil spill damages do not apply to "an action for personal injury or death").

[63]      ORS 646.638(1); ORS 646.608.

[64]      *Gross-Haentjens v. Leckenby*, 589 P.2d 1209, 1210-11 (Or. App. 1979).

[65]      *Id.* at 1210; *see also Fowler v. Cooley*, 245 P.3d 155, 161 (Or. App. 2010).

[66]      *Gross-Haentjens*, 589 P.2d at 1210-11.

negligence, breach of warranty, and strict products liability — and noted that these remedies provide for a more expansive range of damages, such as pain and suffering, not available under the UTPA.[67]

We agree with the reasoning of the Oregon court and conclude that Alaska's UTPA does not provide the basis for a claim for personal injury.

### C.     The Superior Court Did Not Clearly Err In Finding That The Rock Gym Waived Any Claim For Rule 68 Attorney's Fees.

The superior court granted the Rock Gym, as the prevailing party, 20 percent of its reasonable, actual attorney's fees under Civil Rule 82(b)(2). Twenty percent of "actual attorney's fees which were necessarily incurred" is the presumptively reasonable award for a party who prevails in a case resolved short of trial but who does not recover a money judgment.[68]

The Rock Gym contends that it should have been awarded fees under Civil Rule 68 instead. Rule 68 provides that (a) where an adverse party makes an offer to allow judgment entered against it in complete satisfaction of the claim, and (b) the judgment finally entered is at least five percent less favorable to the offeree than the offer, the

---

[67]     *Id.* at 1211. Other courts have reached similar conclusions. *See Beerman v. Toro Mfg. Corp.*, 615 P.2d 749, 754 (Haw. App. 1980) ("[T]hough individual actions based on damage to a consumer's property may be within the purview of [the Hawaii consumer protection act], the scope of the statutes does not extend to personal injury actions."); *Kirksey v. Overton Pub, Inc.*, 804 S.W.2d 68, 73 (Tenn. App. 1990) ("We must hold that the General Assembly intended for the Consumer Protection Act to be used by a person claiming damages for an ascertainable loss of money or property due to an unfair or deceptive act or practice and not in a wrongful death action."); *Stevens v. Hyde Athletic Indus., Inc.*, 773 P.2d 871, 873 (Wash. App. 1989) ("We hold actions for personal injury do not fall within the coverage of the [Washington consumer protection act].").

[68]     *See Williams v. Fagnani*, 228 P.3d 71, 77 (Alaska 2010) ("Awards made pursuant to the schedule of Civil Rule 82(b) are presumptively correct.").

offeree shall pay a percentage of the reasonable actual attorney's fees incurred by the offeror from the date of the offer, the percentage depending on how close the parties are to trial when the offer is made. The Rock Gym made a Rule 68 offer of judgment on February 7, 2012, over two months before the April trial date. Donahue rejected the offer. Under these facts, once judgment was granted in the Rock Gym's favor, the conditions for an award of 30 percent of "the offeror's reasonable actual attorney's fees" under the Rule 68 schedule were satisfied.[69]

The question presented here, however, is whether the Rock Gym waived any request for Rule 68 fees. The Rock Gym initially argued to the superior court that it should be awarded full fees because of express language in the release, which reads:

> Should [the Rock Gym] or anyone acting on their behalf, be required to incur attorney's fees and costs to enforce this agreement, I agree to indemnify and hold them harmless for all such fees and costs.

While arguing this point, the Rock Gym noted in a footnote that it was eligible for full fees under AS 09.30.65 (the statute authorizing the Rule 68 procedure). But it made that observation only in support of its argument for full fees under the release. Its motion did not otherwise mention Rule 68; rather, as an alternative to fees under the indemnity clause, the Rock Gym asked the court to use its discretion to award up to 80 percent of its fees under Rule 82 — far more than the scheduled award of 20 percent — in light of Donahue's "vexatious" behavior, particularly having complicated the case with claims under the UTPA.

---

[69] Alaska R. Civ. P. 68(b)(3). We note that the award of fees under Rule 68 was likely to be only nominally greater than that under Rule 82. Rule 68 affects only fees incurred after the date the offer is made, here February 7, 2012. The parties had already completed their summary judgment briefing by that time, and summary judgment was entered a month later.

The superior court denied the Rock Gym's request for full fees based on the release and ordered it to submit an affidavit detailing its counsel's billings. The order also stated, "Plaintiff should address the effect, if any, of defendant's Rule 68 offer on the amount of fees that may be awarded." The Rock Gym submitted the required fee affidavit and also moved for reconsideration, again arguing that full fees should be awarded under the release's indemnity clause; again relying on Rule 82 as an alternative; and failing to mention Rule 68 at all. Donahue submitted no response.

The superior court again rejected the Rock Gym's argument based on the release's indemnity clause and ordered the Rock Gym to submit a more detailed fee affidavit. The Rock Gym filed another affidavit which did not address the offer of judgment.

In its third order, the superior court again rejected the Rock Gym's request for full attorney's fees and awarded 20 percent of its fees under Rule 82(b)(2). The Rock Gym again moved for reconsideration. This time the Rock Gym argued that it was entitled to 30 percent of its fees under Rule 68, relying on the footnote in its first motion to contend that the argument was not waived.[70]

The superior court then issued its fourth order on fees. It reaffirmed its Rule 82 award, finding that the Rock Gym had not adequately or timely made a claim under Rule 68. The court observed that the Rock Gym's failure to make the claim earlier was likely a "tactical decision, initially, to pursue full attorney fees based on indemnity rather

---

[70] As noted above, the increased percentage of attorney's fees would only apply to those fees incurred after the date the offer of judgment was made; the amount at issue thus appears to be minimal.

than present all of its alternative fee award theories at once."

The superior court's finding that the Rock Gym waived a request for fees under Rule 68 is reviewed for clear error.[71] We see no clear error here. The Rock Gym's reference to its offer of judgment in its motion for attorney's fees was made only to support its request for full fees under the indemnity provision of the release; the only alternative it expressly requested was an award of enhanced fees under Rule 82. As the superior court observed, it was not the court's duty in this context "to solicit additional arguments for a moving party."[72] Nor was the superior court obliged to consider the Rule 68 argument when it was raised for the first time in motions for reconsideration.[73] And under the circumstances of this case, including the modest difference between fee awards under Rule 82 and Rule 68 and an apparent deficiency in the Rule 68 offer itself,[74] we cannot see plain error.[75]

---

[71] *See Sengul v. CMS Franklin, Inc.*, 265 P.3d 320, 324 (Alaska 2011).

[72] *See, e.g.*, *Forshee v. Forshee*, 145 P.3d 492, 498 (Alaska 2006).

[73] *See Haines v. Cox*, 182 P.3d 1140, 1144 (Alaska 2008) (holding that the plaintiff's submission of evidence only when she moved for reconsideration forecloses her claim that the court abused its discretion by failing to rely on that evidence); *Koller v. Reft*, 71 P.3d 800, 805 n.10 (Alaska 2003) (noting that superior court is not obliged to consider documents presented for the first time with a motion for reconsideration).

[74] The offer did not encompass the Rock Gym's counterclaim against Donahue for contractual indemnity. *See Progressive Corp. v. Peter ex rel. Peter*, 195 P.3d 1083, 1089 (Alaska 2008) ("Both Rule 68 and AS 09.03.065 . . . implicitly require that an offer of judgment include all claims between the parties and be capable of completely resolving the case by way of a final judgment if accepted.").

[75] The plain error doctrine requires a party to prove that the error waived below was "so prejudicial that failure to correct it will perpetuate a manifest injustice." *Forshee*, 145 P.3d at 500 n.36 (quoting *Hosier v. State*, 1 P.3d 107, 112 n.11 (Alaska (continued...)

## V. CONCLUSION

The judgment of the superior court is AFFIRMED.

---