*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | Supreme Court No. S-17855 |
| OFFICE OF PUBLIC ADVOCACY, | ) | |
| | ) | O P I N I O N |
| Regarding appointment ordered in *Smith v.* | ) | |
| *Smith*, Superior Court No. 4BE-19-00403 CI | ) | No. 7610 – August 12, 2022 |
| | ) | |

Petition for Review from the Superior Court of the State of Alaska, Fourth Judicial District, Bethel, Terrence P. Haas, Judge.

Appearances: Elizabeth Russo, Deputy Director, Assistant Public Advocate, Office of Public Advocacy, and James E. Stinson, Public Advocate, Anchorage, for Petitioner. Samuel J. Fortier, Fortier & Mikko, PC, Anchorage, for Respondent Fannie Berezkin f/k/a Fannie Smith. No appearance by Respondent Harold Smith. Sydney Tarzwell, Alaska Legal Services Corporation, Anchorage, for Amicus Curiae Alaska Legal Services Corporation.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

CARNEY, Justice.
BORGHESAN, Justice, concurring.

## I.     INTRODUCTION

We granted the Office of Public Advocacy's (OPA) petition for review on the question whether counsel provided through Alaska Legal Service Corporation's (ALSC) pro bono program is counsel "provided by a public agency" within the meaning

of *Flores v. Flores*[1] and OPA's enabling statute.[2]  We conclude that such counsel is "provided by a public agency" and we affirm the superior court's order appointing OPA to represent an indigent parent in a child custody case.

## II.    FACTS AND PROCEEDINGS

In October 2019 Fannie Berezkin contacted ALSC for help obtaining a divorce from Harold Smith.  To serve as many indigent Alaskans as possible, ALSC's pro bono program matches clients who are eligible for ALSC services with volunteer attorneys.  ALSC assigned Samuel Fortier, a private attorney who volunteered for an assignment through ALSC's pro bono program.  Fortier filed a complaint for divorce and sole legal and physical custody of Berezkin and Smith's child.  In mid-December Smith filed an affidavit with the court in response.  It does not appear that Smith served the affidavit on Berezkin, and two days after the filing, Berezkin moved for entry of default against Smith.

At a status hearing in February 2020 the court noted that after it received Berezkin's request for entry of default, it had reviewed the file and discovered Smith's affidavit.  Berezkin then withdrew her request.  The court advised Smith that he had the right to hire an attorney; Smith responded that he was indigent and asserted a right to have one appointed under the Sixth Amendment.  The court suggested that Smith read the *Flores* case and research his right to appointed counsel.  Smith, who was incarcerated, explained that the law library at the prison was unavailable because the

---

[1]    598 P.2d 893, 895-96 (Alaska 1979) (holding that due process required appointment of counsel for indigent parent in child custody case when other parent was represented by ALSC, a public agency).

[2]    *See* AS 44.21.410(a)(4) (requiring OPA to provide counsel "to indigent parties in cases involving child custody in which the opposing party is represented by counsel provided by a public agency").

internet was not working. The court set trial for April and scheduled a status hearing for mid-March. The court also agreed to send a letter to the prison explaining that Smith would benefit from the use of the law library.

Smith did not appear for the March status hearing, but filed a motion for assistance of counsel that day. He argued that because Berezkin was represented by a lawyer provided by ALSC, he was entitled to appointed counsel. He explained he was indigent and did not have the proper training to represent himself and described his efforts to obtain a lawyer through ALSC. He also submitted an affidavit explaining that he had attempted to arrange transportation to the status hearing, but had been told transportation was provided only in criminal proceedings. Berezkin filed a non-opposition to Smith's motion for appointed counsel.

The superior court granted Smith's motion and ordered OPA to "designate counsel to assist Mr. Smith in these proceedings." Two weeks later OPA moved to vacate the appointment. It argued that because Berezkin was being represented by a private attorney working with ALSC's pro bono program, Smith was not entitled to representation under *Flores*. OPA argued that ALSC's support for its pro bono attorneys was "de minimis" and contrasted it with the support ALSC provided to its staff attorneys. OPA further argued that it was not statutorily authorized to provide representation to Smith and did not have sufficient resources to provide services if the right to counsel under *Flores* included such cases.

Berezkin opposed OPA's motion to vacate, arguing that *Flores* and OPA's enabling statute[3] required only that the other parent's counsel be "provided by" a public agency not that the public agency assign a staff attorney. She also argued that ALSC

_____

[3]     *Id.*

provided substantial support to its pro bono attorneys and that Smith was disadvantaged because of Berezkin's representation. She pointed out that of 500 custody cases handled by ALSC in the past year, pro bono counsel were assigned in only 7 and that requiring OPA to provide representation in such cases would not be a substantial additional burden.

ALSC was granted leave to file an amicus brief. ALSC supported broad access to representation for low-income Alaskans and noted that having opposing counsel instead of a self-represented opposing party often led to speedy resolution of the case. It argued that due process required the appointment of counsel in cases like Smith's and that its cooperating pro bono attorneys were provided by ALSC and supported by public funds. ALSC agreed with Berezkin that providing counsel when the other party had an ALSC pro bono attorney would not place a large burden on OPA because ALSC did not provide pro bono counsel to many clients; it noted that this issue had not come up previously in the 40 years since *Flores* was decided. In reply OPA reiterated its initial arguments.

The court denied OPA's motion to vacate. It held that denying Smith appointed counsel while Berezkin was represented by an ALSC pro bono attorney violated due process because

> the existence of a publicly funded program that organizes, trains, and insures lawyers to whom it then refers pre-screened clients who thereby enjoy the benefit of a no-cost attorney with access to the administrative resources and legal clout of a federally grant-funded statewide agency inevitably affords "advantages" well beyond the mere cost of counsel.

It noted that Smith would be at a disadvantage when "squar[ing] up against an opposing lawyer provided by and substantially supported by what is quite likely Alaska's largest public interest law firm," which was "made possible by the presence of public funding

and support."

OPA moved to stay the proceedings and petitioned for interlocutory review. We granted OPA's petition, but denied the stay and directed OPA to continue representing Smith. According to ALSC and Berezkin, the case settled two weeks after OPA counsel was appointed.[4]

## III. STANDARD OF REVIEW

"We apply our independent judgment in determining mootness because, as a matter of judicial policy, mootness is a question of law."[5] Whether a pro bono attorney provided through ALSC's pro bono program qualifies as "counsel provided by a public agency" under AS 44.21.410(a)(4) is a question of law, which we review de novo.[6]

## IV. DISCUSSION

### A. The Appeal Satisfies The Public Interest Exception To The Mootness Doctrine.

Because the case settled soon after OPA was appointed and petitioned for review, this case is moot.[7] But "[e]ven when a case is moot, we may address certain issues if they fall within the public interest exception to the mootness doctrine."[8] "The

---

[4] Smith's attorney did not sign the notice to court stating that the parties had settled and OPA did not mention this fact in its briefing. However, OPA conceded at oral argument that this case was moot.

[5] *Akpik v. State, Off. of Mgmt. & Budget*, 115 P.3d 532, 534 (Alaska 2005).

[6] *See Harrold-Jones v. Drury*, 422 P.3d 568, 570 (Alaska 2018).

[7] *See Fairbanks Fire Fighters Ass'n, Loc. 1324 v. City of Fairbanks*, 48 P.3d 1165, 1167 (Alaska 2002) ("A claim is moot if it is no longer a present, live controversy . . . .").

[8] *Akpik*, 115 P.3d at 535.

exception consists of three factors: '(1) whether the disputed issues are capable of repetition, (2) whether the mootness doctrine, if applied, may cause review of the issues to be repeatedly circumvented, and (3) whether the issues presented are so important to the public interest as to justify overriding the mootness doctrine.' "[9]

This case satisfies all of the criteria for the public interest exception to mootness. First, whether the other party is entitled to appointed counsel may arise any time ALSC assigns pro bono counsel in a custody dispute and the other party is indigent. Second, as happened here, the appointment of counsel may lead to settlement of the case, which would eliminate an appeal of the issue. And because the indigent party who could benefit from counsel's appointment pursuant to *Flores* will always be unrepresented, that party is unlikely to rely on *Flores* to request appointed counsel. Third, there is an important public interest in resolving the issue because it implicates the constitutional right "to direct the upbringing of one's child."[10] We therefore address the issue despite this case's mootness.

### B.    An Overview Of *Flores*, Its Progeny, And AS 44.21.410(a)(4).

In *Flores* we recognized a due process right under the Alaska constitution to appointed counsel for indigent parents in custody cases when the other parent is represented by ALSC.[11] We held that, based on the importance of "the right to direct the upbringing of one's child" and the "exceedingly difficult" nature of determining a child's

_____

[9]      *Id.* (quoting *Kodiak Seafood Processors Ass'n v. State*, 900 P.2d 1191, 1196 (Alaska 1995)).

[10]      *Flores v. Flores*, 598 P.2d 893, 895 (Alaska 1979) ("The interest at stake in this case is one of the most basic of all civil liberties, the right to direct the upbringing of one's child.").

[11]      *Id.* at 894.

best interests, an unrepresented parent is at a "decided and frequently decisive disadvantage" facing a represented opposing parent and that disadvantage becomes "constitutionally impermissible where the other parent has an attorney supplied by a public agency."[12] We observed that because the unrepresented mother lived in a different state and was not able to travel to Alaska, she would "lose the custody proceeding by default" if she were not to secure representation.[13] We held that "[f]airness alone dictate[d]" that an indigent, unrepresented parent facing "counsel provided by a public agency" should have appointed counsel.[14] We ordered that the court appoint counsel paid by the court system because ALSC did not have the capacity to provide conflict-free counsel and the Public Defender Agency's enabling statute did not require the agency to provide counsel in child custody cases.[15]

In 1984 the Alaska legislature created OPA[16] and directed that, among its other obligations, OPA "shall . . . provide legal representation . . . to indigent parties in cases involving child custody in which the opposing party is represented by counsel provided by a public agency."[17] We later observed that "[t]his language appears to have been drawn directly from *Flores*."[18]

---

[12]      *Id.* at 895-96.

[13]      *Id.* at 896.

[14]      *Id.* at 895.

[15]      *Id.* at 896-97.

[16]      *See* ch. 55, § 1, SLA 1984.

[17]      AS 44.21.410(a)(4).

[18]      *In re Alaska Network on Domestic Violence & Sexual Assault*, 264 P.3d
(continued...)

In 2011 we decided *In re Alaska Network on Domestic Violence & Sexual Assault* (*ANDVSA*),[19] reiterating our holding from *Flores* "that it would be fundamentally unfair, in the specific context of child custody disputes, to allow public funding to support one party but not that party's indigent opponent."[20] We therefore concluded that ANDVSA, a nonprofit corporation receiving 99% of its funding from federal and state government, was a public agency for the purposes of *Flores*.[21] We emphasized that the right to counsel in this context "arises, at least in part, from the government's otherwise one-sided support for the party with an attorney supplied by a public agency."[22]

## C.    Smith Was Entitled To *Flores* Counsel.

OPA argues that the *Flores* decision was based on consideration of "due process being afforded a parent who was facing a *de facto* termination of her parental rights as a direct result of the custody case" and urges to us apply the *Mathews v. Eldridge* balancing test.[23] But we have never construed *Flores* so narrowly:    in

---

[18]    (...continued)
835, 838 (Alaska 2011).

[19]    *Id.*

[20]    *Id.* at 836.

[21]    *Id.* at 839-41.

[22]    *Id.* at 838; *cf. Dennis O. v. Stephanie O.*, 393 P.3d 401, 403-04, 406 (Alaska 2017) (declining to extend right to appointed counsel to indigent parent when other parent represented by private counsel).

[23]    424 U.S. 319, 335 (1976). *Mathews* established a balancing test which weighs the following three factors to determine whether an individual has received due process:

First, the private interest that will be affected by the official

(continued...)

*ANDVSA*, we held simply that *Flores* applied in "the specific context of child custody disputes."[24]  *Flores* (and OPA's subsequent enabling statute) require appointment of counsel when the opposing parent has "counsel provided by a public agency," not by engaging in an analysis of the *Mathews* balancing test.[25]

Here, Berezkin obtained counsel through ALSC in a child custody matter with Smith, and ALSC assigned one of its pro bono attorneys to her case.  The issue before us is whether ALSC pro bono counsel is counsel "provided by" ALSC and supported by public funds, giving the represented parent a "constitutionally impermissible" advantage over the unrepresented parent under *Flores*.[26]

OPA argues that pro bono attorneys are only loosely affiliated with ALSC, and that the resources ALSC provides are "aimed at attorneys in order to encourage them to volunteer" and do not confer any special advantage on the litigants themselves.  ALSC counters that the only difference between a client represented by a pro bono attorney and one represented by a staff attorney is that ALSC does not pay the salary of the pro bono attorney.  ALSC emphasizes its attorney-client relationship with the pro bono client and

---

[23]    (...continued)
action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Id.* at 335.

[24]    *ANDVSA*, 264 P.3d at 836.

[25]    *Cf. Dennis O.*, 393 P.3d at 403-04, 406 (concluding due process does not require appointing counsel for parent when other parent retained private counsel).

[26]    *Flores v. Flores*, 598 P.2d 893, 896 (Alaska 1979).

that the resources it provides pro bono attorneys are the same as those available to ALSC attorneys.

According to ALSC, it "is Alaska's largest and oldest agency providing free civil legal assistance to low-income Alaskans." ALSC is primarily funded by the Legal Services Corporation (LSC), a nonprofit corporation established to provide federal funding to legal service providers across the country. LSC requires legal service providers that receive funds from it to maintain a pro bono program "to stretch scarce public funds available for representation of indigent people." All clients, including those who will be represented by pro bono attorneys, are screened for eligibility[27] and conflicts and have an attorney-client relationship with ALSC. And if the pro bono attorney withdraws from the case, ALSC still continues to represent the client.

ALSC's pro bono attorneys are unpaid volunteers. But ALSC provides malpractice insurance and reimburses their litigation expenses. ALSC also gives its pro bono attorneys office space, access to its law library and training, and mentorship by staff attorneys. In 2015 ALSC formalized its training program with a Pro Bono Training Academy "to assist pro bono volunteers in areas of law that may be unfamiliar to them." ALSC also employs "multiple staff . . . to work [exclusively] on pro bono-related projects."

In *Flores* we focused on the advantage that a parent represented by counsel from a public agency has in a custody case.[28] An ALSC client receives the same level of representation whether ALSC assigns a staff attorney or a volunteer attorney to the case. The parent is screened by ALSC staff for eligibility and accepted as an ALSC

---

[27]    ALSC provides services to clients who qualify as "low income."

[28]    *Flores*, 598 P.2d at 895-96.

client before an attorney is assigned. The assigned attorney receives support from the same ALSC staff and has access to the same ALSC resources. Here, ALSC determined that Berezkin was eligible for its services and then provided her an attorney. Although Berezkin's attorney was a private attorney who volunteered to take a case assignment from ALSC, he was "provided" to her by ALSC and afforded her the same advantage as an ALSC staff attorney. And unlike an attorney who takes a pro bono case independent of the ALSC program, Berezkin's attorney received ALSC training, mentorship, and institutional support.[29]

In *ANDVSA* we underscored "the fundamental imbalance of power that occurs when one side has an attorney being paid in part by public funding and the other side is indigent and is without any counsel."[30] We recognized that "support need not be provided exclusively through funding or the direct provision of government resources; but fairness considerations undoubtedly do arise where one party benefits from the government's funding of a 'public agency.' "[31] We also concluded that "the term 'public agency' . . . must be understood as referring primarily to the nature of an organization's

---

[29] OPA also argues that "other publicly available resources . . . level the playing field for self-represented litigants," and lists telephonic hearings, the Family Law Self-Help Center, the Early Resolution Program, informal trials, and the leniency afforded to pro se litigants. But as ALSC points out, many of these resources were not available to Smith because he was incarcerated. And many of these resources were available when we decided *ANDVSA* in 2011. *See* Stacey Marz, *Early Resolution for Family Law Cases in Alaska's Courts*, 31 ALASKA JUSTICE FORUM, Spring/Summer 2014, at 13 (describing establishment of Family Law Self-Help Center in 2001 and Early Resolution Program between 2009 and 2011); *Breck v. Ulmer*, 745 P.2d 66, 75 (Alaska 1987) (requiring lenience to pro se litigants).

[30] *ANDVSA*, 264 P.3d 835, 838 (Alaska 2011).

[31] *Id.*

funding sources, and not to an organization's status as a government agency."[32] We held that ANDVSA qualified as a public agency because it was supported by public funding.[33]

Public funds also support ALSC's pro bono program: LSC, which provides ALSC's largest source of funding, requires that 12.5% of its grant be used for the pro bono program. With those funds ALSC provides pro bono attorneys training, malpractice insurance, office services, and space to meet with their clients. The funds are also used for staff to screen prospective clients and support pro bono attorneys. And although OPA argues that "[t]he resources that ALSC puts into its program are . . . not specifically provided to litigants," the same is true for all ALSC clients, and all law firms and agencies.

Neither *Flores* nor *ANDVSA* requires an analysis of whether and how public funds are expended by the public agency in a particular case.[34] Whether the attorney assigned by ALSC was a paid staff attorney or an unpaid volunteer pro bono attorney is not dispositive. Because Berezkin's attorney was "provided by a public agency," Smith is entitled to appointed counsel.[35]

---

[32]    *Id.* at 839.

[33]    *Id.* at 838, 841.

[34]    Moreover, because ALSC receives funding from both private and public sources, it is possible that some of its staff may be supported more by private than by public funds. The source of an individual employee's salary, however, does not determine whether the agency is a public agency and is not relevant to our determination that attorneys volunteering in ALSC's pro bono program are "provided by a public agency."

[35]    OPA's concern that requiring appointment of counsel in cases involving ALSC pro bono attorneys "will significantly increase the number of cases to which OPA is appointed" appears to be unfounded based upon the statistics provided by ALSC. In

(continued...)

## V.   CONCLUSION

We AFFIRM the superior court's order appointing counsel to Smith.

---

[35] (...continued)
any case, because counsel is required under *Flores*, OPA is statutorily required to provide representation. *See* AS 44.21.410(a)(4).

BORGHESAN, Justice, concurring.

I agree with the court's decision to affirm the superior court based on the conclusion that this case is not meaningfully distinguishable from *Flores v. Flores*.[1] OPA does not ask us to revisit *Flores* or otherwise attempt to argue that ALSC is not a "public agency." It argues solely that pro bono volunteers are not "provided by" ALSC and therefore do not fall under the holding of *Flores* or OPA's enabling statute. The record in this case shows that ALSC recruits pro bono attorneys and uses its own funds to give these attorneys substantial administrative and other support. ALSC therefore "provides" these attorneys to ALSC's clients, so under the holding and logic of *Flores*, attorneys volunteering through ALSC's pro bono program are "counsel provided by a public agency."[2] And that must be true as well for a statute that appears to simply codify the *Flores* ruling.[3]

However, I write separately because subsequent decisions have undercut the basis for *Flores*'s holding that ALSC is a public agency — a holding that Justice Stowers described as resting on a "complete lack of analysis or explanation" and a "justification unconsidered and derived from whole cloth."[4] Whatever doctrinal and practical justification *Flores* may once have had is now substantially eroded.

First, it is doubtful whether merely receiving public funds remains enough

---

[1]     598 P.2d 893 (Alaska 1979).

[2]     *Id.* at 895.

[3]     AS 44.21.410(a)(4) (requiring OPA to "provide legal representation . . . to indigent parties in cases involving child custody in which the opposing party is represented by counsel provided by a public agency").

[4]     *In re Alaska Network on Domestic Violence & Sexual Assault*, 264 P.3d 835, 841 (Alaska 2011) (Stowers, J., dissenting).

to transform a corporate entity into a public agency.  In *Anderson v. Alaska Housing Finance Corporation*[5] we articulated a test for when a corporation is a "state actor" for purposes of due process:  "when the State has specifically created that corporation for the furtherance of governmental objectives, and not merely holds some shares but controls the operation of the corporation through its appointees."[6]  If receipt of public funds alone were enough to make a corporation a state actor, it would not have been necessary to apply this test to the Alaska Housing Finance Corporation (AHFC), which receives substantial amounts of public funds.[7]

Second, due process protections now apply to private custody litigation even if no parent is represented by a "public agency."  The State's interference with a parent's custody rights, via the courts, has been held sufficient governmental action to

---

[5]      462 P.3d 19 (Alaska 2020).

[6]      *Id.* at 26-27 (quoting *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995)) (holding that due process applies when Alaska Housing Finance Corporation pursues nonjudicial foreclosure against homeowner).

[7]      *See, e.g.*, AS 18.56.082 (providing that Alaska housing finance revolving fund consists of "appropriations made to the revolving fund by the legislature" as well as other monies); House Bill (H.B.) 69, 32d Leg., 1st Sess. (2021) (enacted) (appropriating funds to Alaska Housing Finance Corporation for fiscal year 2022).

Perhaps there is some distinction to be drawn in the fact that public funds are provided to ALSC specifically for the purpose of litigating the custody rights of private persons, while AHFC's public funding is not expressly provided for the purpose of evicting tenants and mortgage-borrowers (which is a predictable aspect of the home-lending and affordable-housing businesses in which AHFC is engaged).  But it is not obvious that the test for whether a corporate entity is subject to due process should vary based on whether public funds are appropriated to that entity for the express purpose of interfering with private rights or for a purpose that merely entails interference with private rights.

trigger due process and the right to appointed counsel. In *In re K.L.J.* we held that "sufficient state involvement exists" to require appointment of publicly funded counsel in litigation initiated by one parent to terminate the parental rights of the other parent because termination "is accomplished through a state mechanism" — the judicial system.[8] Then in *Dennis O. v. Stephanie O.* we applied the familiar *Mathews v. Eldridge* framework to determine whether due process entitles an indigent parent in custody litigation to appointment of publicly funded counsel when the other parent is represented by private counsel.[9] We held that indigent parents, as a class, are not entitled to publicly funded counsel in a custody dispute merely because the other parent is represented by private counsel.[10] But if particular facts show the indigent parent would be unable to adequately litigate the case, "procedural due process may require court appointment of counsel to a parent in a custody proceeding."[11]

Because *Dennis O.* authorizes appointment of publicly funded counsel when a parent is not capable of self-representation, the practical justification for *Flores* has been undercut. In *Dennis O.*, for example, we concluded that "the probable value of appointing counsel was not sufficiently high" because the father "capably represented himself throughout the hearing" and was not able to identify any way the lack of counsel

---

[8] 813 P.2d 276, 283 (Alaska 1991).

[9] 393 P.3d 401, 406-11 (Alaska 2017) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

[10] *Id.* at 408-09.

[11] *Id.* at 411.

prejudiced him.[12]  By contrast, in this case, the superior court observed that the father faced a disadvantage by being incarcerated with limited access to legal materials. *Dennis O.* ensures publicly funded counsel when it is actually needed — perhaps including cases like this one.  Therefore *Flores*'s much broader holding is no longer necessary to protect parental custody rights.

In the wake of our decision in *Dennis O.*, *Flores*'s holding that ALSC is a public agency creates an arbitrary system.  *Dennis O.* held that litigants in child custody matters whose spouses are represented by private counsel are not, as a class, entitled to publicly funded counsel under the due process clause.[13]  Yet because of *Flores*, litigants in child custody matters whose spouses are represented by private counsel *volunteering through ALSC* are, as a class, entitled to publicly funded counsel.  For purposes of due process, which is concerned with the risk of erroneous deprivation of protected interests,[14] there is no meaningful difference between the two classes.  There is only what *Dennis O.* described as the "inherent unfairness of a state agency representing one parent,"[15] which has no bearing on whether a parent is likely to be erroneously deprived of custody.

Finally, *Flores* opens the door to doctrinal inconsistency.  If ALSC is a

---

[12]     *Id.* at 410.

[13]     *Id.* at 408-09.

[14]     *See Seth D. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1222, 1227 (Alaska 2008) (requiring court assessing whether proceedings comport with due process to consider "the risk of an erroneous deprivation of [a protected] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards" (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976))).

[15]     *Dennis O.*, 393 P.3d at 408.

public agency for these purposes, why not in other contexts? For example, it seems unlikely that an employee of ALSC has a First Amendment right against being fired for offensive speech.[16] It seems equally unlikely that representation by ALSC is a public benefit entitling ALSC's clients to notice and a hearing before representation is terminated.[17] If concerns about perception of fairness raised by ALSC receiving funds from the government are significant enough to justify constitutional protections for its adversaries in court, why not for its own employees and clients? I do not see a principled way to carve out public agency status for this one purpose.

Nevertheless, if *Flores* is our starting point — and OPA does not ask us to revisit *Flores* — then I agree with the conclusion the court reaches in this case.

---

[16] *Cf. Methvin v. Bartholomew*, 971 P.2d 151, 154 (Alaska 1998) ("[T]he State may not fire a public employee for exercising the right to free speech protected by the First Amendment to the United States Constitution. This is because 'implicit in [a] contract of employment [is] the State's promise not to terminate [the employee] for an unconstitutional reason.' " (quoting *State v. Haley*, 687 P.2d 305, 318 (Alaska 1984))).

[17] *Cf. Heitz v. State, Dep't of Health & Soc. Servs.*, 215 P.3d 302, 305 (Alaska 2009) ("Due process of law requires that before valuable property rights can be taken directly or infringed upon by governmental action, there must be notice and an opportunity to be heard." (quoting *Bostic v. State, Dep't of Revenue, Child Support Enf't Div.*, 968 P.2d 564, 568 (Alaska 1998))).