*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

# THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| NATIVE VILLAGE OF KWINHAGAK, | ) ) ) | Supreme Court No. S-18481 |
| Appellant, | ) ) | Superior Court No. 4BE-19-00046 CN |
| v. | ) ) ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES; MIRA J.; and ELAINE G., | ) ) ) ) ) ) | No. 7684 – February 9, 2024 |
| Appellees. | ) ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Bethel, Terrence P. Haas, Judge.

Appearances: Pearl E. Pickett, Alaska Legal Services Corporation, Anchorage, for Appellant. Laura Fox, Senior Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for State of Alaska. Katie Stephenson, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Mira J. Justin Gillette, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Elaine G.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

BORGHESAN, Justice.

## I.   INTRODUCTION

This case is about the legal process that applies when the Office of Children's Services (OCS) seeks to admit a child in its custody to the hospital for psychiatric care.  The teenaged child at the center of this case was hospitalized continuously for 46 days — first at a local hospital, then at North Star Hospital, an acute psychiatric hospital for minors — before the court held a hearing to decide whether her hospitalization was justified.

The statutes governing child in need of aid (CINA) proceedings give OCS the duty and authority to seek emergency medical care for the children in its custody.  One statute in particular, AS 47.10.087, requires judicial review when OCS seeks to place a child at a secure residential psychiatric treatment facility.  But the facilities to which OCS brought the child in this case do not meet that definition.  And there is no other provision of the CINA statutes that limits OCS's authority to seek admission of children to the hospital for psychiatric care.  OCS is subject only to an injunction that requires an "AS 47.10.087-type hearing" to be held within 30 days after it admits a child to North Star.

The child's tribe argues that a different statutory framework governed the child's hospitalization:  the civil commitment statutes.  The Tribe also argues, in the alternative, that the constitution did not permit OCS to hospitalize a child for such a long time without a court hearing to determine whether the hospitalization was justified.

We reject the Tribe's statutory argument.  OCS was not required to follow the civil commitment statutes when admitting the child to either hospital.  However, when OCS sought to admit the child to the hospital for psychiatric care, the due process clause of the Alaska Constitution required OCS to promptly notify the parties to the CINA case.  Due process also required the court to hold a hearing as soon as reasonably possible to determine whether the hospitalization was justified.  The 46-day wait between the child's first admission to the hospital and the hearing held in this case was

far too long to satisfy due process. We therefore reverse the court's order authorizing the child's continued hospitalization.

## II. FACTS AND PROCEEDINGS

### A. Mira's Hospitalization

Mira J., a member of the Native Village of Kwinhagak (the Tribe), was adjudicated a child in need of aid and placed in OCS custody in late 2019.[1] She was 14 years old at the time. The Tribe intervened as a party in the CINA case. OCS placed Mira in foster care in Sitka.

Mira's foster parent brought her to Sitka Community Hospital (Sitka) on December 3, 2021, after Mira consumed alcohol and her foster parent's prescription medication. Ten days later OCS issued a "delayed notice of change of placement" to the parties to the CINA case to inform them that it had "placed" Mira at Sitka.

Within a few hours of Mira's admission to Sitka, a clinician advised that Mira did not require "24/7 supervision[,] just ongoing counseling and support." But Mira's previous foster family refused to accept her back into their home due to her behaviors. While OCS looked for another foster home, Mira "opened up about her past trauma" to the Sitka clinician and experienced ataxia[2] symptoms and a panic attack that caused her to struggle "to move her limbs and to breathe." These events caused the clinician to recommend "acute residential treatment," and OCS transferred Mira to North Star Hospital (North Star), a psychiatric hospital in Anchorage. The record does not specify when the Sitka clinician changed her recommendation, although OCS

---

[1] A pseudonym is used to protect her privacy.

[2] "An inability to coordinate muscle activity during voluntary movement; most often results from disorders of the cerebellum or the posterior columns of the spinal cord; may involve the limbs, head, or trunk." *Ataxia*, STEDMAN'S MEDICAL DICTIONARY, Westlaw (database updated Nov. 2014).

apparently decided to transfer Mira to North Star by December 14.[3] Mira was moved directly from Sitka to North Star on December 20 or 21. OCS notified the parties on December 22 that Mira had been moved to North Star, only after the Tribe requested an update on Mira's status.

### B. Legal Proceedings

On December 22 the Tribe moved for a hearing and expedited consideration under the civil commitment statutes (AS 47.30.700 – 47.30.815). This was the first request for judicial review of Mira's inpatient psychiatric treatment by any party. OCS did not oppose the Tribe's request for a hearing or expedited consideration, but OCS did not agree that the superior court should apply the civil commitment statutes. The superior court issued an order appointing counsel for Mira and scheduling a hearing for December 30, 2021 — 27 days after Mira had first been hospitalized and 8 days after OCS had transferred her to North Star.

The superior court repeatedly rescheduled that hearing to ensure that counsel could represent Mira and that a key witness from North Star could attend. The court finally considered the Tribe's motion at a hearing on January 18, 2021 — 46 days after Mira had been initially hospitalized at Sitka and 29 days after OCS transferred her to North Star.

During these proceedings the parties advanced different positions on the legal framework applicable to Mira's case. OCS asserted that because it had legal custody of Mira under the CINA statutes, it had authority to admit her to the hospital for psychiatric care, subject only to a permanent injunction issued by the superior court in *Native Village of Hooper Bay v. Lawton*.[4] In that case the superior court considered

---

[3]    The assigned OCS caseworker was on leave when Mira's foster parent brought her to Sitka and was not part of the decision to transfer Mira to North Star. The decision to transfer Mira to North Star had already been made by the time the caseworker returned to the office on December 14.

[4]    No. 3AN-14-5238 CI (Alaska Super., Feb. 12, 2015).

whether AS 47.10.087, which governs OCS's authority to place children in its custody in a "secure residential psychiatric treatment center," applied to North Star.[5] The court held that North Star did not meet the statutory definition, so the standards of AS 47.10.087 were not directly applicable.[6] But it concluded that the constitution required some judicial oversight of OCS's decision to admit a child to an acute psychiatric hospital like North Star.[7] Accordingly the court enjoined OCS "from holding any child under the care of OCS for longer than 30 days at North Star Hospital without conducting an AS 47.10.087-type of hearing."[8] In the January hearing regarding Mira's hospitalization, OCS maintained that the *Hooper Bay* injunction established the correct procedure for Mira's admission to North Star.

The Tribe countered that the court must instead review Mira's hospitalization according to the civil commitment statutes. Those statutes authorize any person to petition for the evaluation and involuntary psychiatric hospitalization of an adult or minor.[9] When a petition for civil commitment is filed, the court's

---

[5]    *Id.* at 7.

[6]    *Id.* at 9-10.

[7]    *Id.* at 16-18.

[8]    Under AS 47.10.087, OCS may place a child in its custody in a "secure residential psychiatric treatment center" if a court finds, "based on the testimony of a mental health professional, that (1) the child is gravely disabled or is suffering from mental illness and, as a result, is likely to cause serious harm to the child or to another person; (2) there is no reasonably available, appropriate, and less restrictive alternative for the child's treatment or that less restrictive alternatives have been tried and have failed; and (3) there is reason to believe that the child's mental condition could be improved by the course of treatment or would deteriorate if untreated."

[9]    AS 47.30.700 (authorizing "any adult" to petition for screening investigation and judicial determination within 48 hours whether "there is probable cause to believe the respondent is mentally ill and that condition causes the respondent to be gravely disabled or to present a likelihood of serious harm to self or others"); *see also* AS 47.30.705 and AS 47.30.707(a) (authorizing peace officer, mental health

-5-                                                                                                  7684

involvement is triggered almost immediately, and a contested hearing must be held within a matter of days to review whether involuntary hospitalization is justified.[10]

The parties also disagreed over whether the evidence justified Mira's hospitalization under either legal framework. OCS and Mira's guardian ad litem (GAL) argued, pursuant to AS 47.10.087, that Mira suffered from mental illness, was likely to cause serious harm to herself or others, and should remain at North Star until accepted into a less restrictive facility. OCS presented the testimony of North Star's clinical director. The director testified that Mira's psychiatrist had diagnosed her with various mental health conditions. The director opined that those conditions, paired with Mira's verbal aggression toward peers and suicidal thoughts, suggested that Mira would deteriorate if untreated and was likely to harm herself or others. Under cross-examination, the director recounted an episode in which Mira had consumed hand sanitizer. When asked about less restrictive alternatives, the director explained that she had sent referrals to several in-state residential facilities a week prior and had not yet heard back from any of them. OCS also presented testimony by the assigned caseworker, who confirmed that Mira had "very clearly stated that she is not happy being there, that she does not want to be at North Star."

Mira and her mother argued that OCS did not prove that Mira was likely to harm herself or others and that OCS had not met its burden to show that there was no less restrictive alternative to her placement at North Star. The Tribe joined these arguments, adding that OCS had transferred Mira to North Star "without giving [Mira] any sort of hope of due process." The Tribe also asked the court to "rule on whether or not this is, in fact, an [AS 47.10.087] proceeding" or "a continuation of a civil commitment that should have been initiated at the beginning of December."

---

officer, or other medical professional to take person into custody for evaluation starting within 24 hours of arrival).

[10]     *See* AS 47.30.700-.730.

The superior court entered an oral ruling. It ruled that AS 47.10.087 applied to Mira's proceedings and that the civil commitment statutes did not (the court did not mention the *Hooper Bay* injunction). Yet the court expressed ambivalence about its decision. It drew comparisons between Mira's case and our decision in *In re Hospitalization of April S.*, which concerned OCS's attempt to rely on the civil commitment statutes to admit a minor to a state-run psychiatric facility.[11] The court stated that in both cases, "you have a child who's been admitted to a facility, whether it's admitted with [or without] consent of a parent, and then it's . . . at the hands of OCS to, if it's under a .087, to get the ball rolling to find a less restrictive facility." But the court observed that if the minor's admission was pursuant to the civil commitment statutes, "much more rights are entitled to the minor." The court questioned "why somebody in OCS custody would be entitled to less rights," but concluded "that's clearly what 47.10.087 does." Although the court determined that AS 47.10.087 applied to Mira's proceedings, it expressed reservations about this result and suggested that parties' actual practice should be closer to what is required by civil commitment statues, which the court opined were "not a great burden on anybody."

The court then found that the criteria of AS 47.10.087 had been met. It determined that although Mira was "not intending to overdose" on the substances that brought her to Sitka, she was "getting close to that, an attempt to kill herself." The hand sanitizer incident suggested to the court that "she's continuing to engage in this type of behavior." The court therefore concluded that Mira was suffering from mental illness "and as a result, is likely to cause serious harm to herself."

The superior court rebuked North Star and OCS for failing to apply to less restrictive facilities until a few days before the hearing, characterizing this failure as "a lack of planning and foresight." But it nonetheless found that no less restrictive

---

[11]     499 P.3d 1011, 1012 (Alaska 2021).

alternative was available at that time. Finally, the court expressed skepticism that Mira's condition would improve at North Star, but found that "her condition would deteriorate if . . . untreated." The court authorized Mira's continued placement at North Star for 90 days[12] but set another hearing three weeks later to review placement options.

The Tribe appeals. It challenges the superior court's ruling on the applicable legal framework but not the court's factual findings.

## III. STANDARDS OF REVIEW

Because the Tribe asks this court only to interpret statutes and the Alaska Constitution, de novo review applies.[13] We adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[14]

Questions of standing and mootness "are questions of law involving matters of judicial policy," so we use our independent judgment when answering them.[15]

We review issues raised for the first time on appeal for plain error.[16] Plain error exists if an "obvious mistake"[17] is "so prejudicial that failure to correct it will perpetuate a manifest injustice."[18]

---

[12] *See* AS 47.10.087 (instructing courts to review placements made under the statute "at least once every 90 days").

[13] *Petrolane Inc. v. Robles*, 154 P.3d 1014, 1018 (Alaska 2007).

[14] *Id.*

[15] *Fairbanks Fire Fighters Ass'n, Loc. 1324 v. City of Fairbanks*, 48 P.3d 1165, 1167 (Alaska 2002).

[16] *In re Hospitalization of Connor J.*, 440 P.3d 159, 163 (Alaska 2019).

[17] *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014).

[18] *Donahue v. Ledgends, Inc.*, 331 P.3d 342, 356 n.75 (Alaska 2014) (quoting *Forshee v. Forshee*, 145 P.3d 492, 500 n.36 (Alaska 2006)). Although the Tribe argues that the plain error standard is more permissive in the constitutional context, the case it cites discusses the criminal plain error rule, which arises from Alaska

## IV. DISCUSSION

### A. We Consider Most Issues Raised By The Tribe Under The Public Interest Exception To The Mootness Doctrine.

This case presents several statutory and constitutional questions: (1) whether OCS must follow civil commitment procedures when admitting children in its custody to a hospital for psychiatric treatment; (2) whether the Tribe has standing to assert Mira's constitutional rights; and (3) whether the lengthy period that Mira was hospitalized at OCS's direction before a hearing was held satisfies Alaska's constitutional guarantees of equal protection and due process. All of these questions are moot because Mira was discharged from psychiatric hospitalization long ago. But with one exception, we decide these issues under the public interest exception to the mootness doctrine.

We consider three factors when deciding to apply the public interest exception to the mootness doctrine: "(1) whether the disputed issues are capable of repetition, (2) whether the mootness doctrine, if applied, may cause review of the issues to be repeatedly circumvented, and (3) whether the issues presented are so important to the public interest as to justify overriding the mootness doctrine."[19]

These factors support addressing most of the issues raised by the Tribe. Although the superior court's order has long expired, the State concedes that most issues the Tribe raises will recur and, due to the typically short periods of hospitalization, will repeatedly evade review. Clarifying the legal protections for a

---

Criminal Rule 47(b) and does not apply here. *See Adams v. State*, 261 P.3d 758, 770-71 (Alaska 2011).

[19] *Blythe P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 524 P.3d 238, 244 (Alaska 2023) (quoting *In re Off. of Pub. Advoc.*, 514 P.3d 1281, 1285 (Alaska 2022)); *id.* (noting "no one factor is dispositive").

vulnerable population of children in state custody is of utmost public importance.[20] We must therefore determine which statutory framework governs the acute psychiatric hospitalization of minors in OCS custody and whether that framework satisfies constitutional requirements.

However, we agree with the State that the public interest exception to the mootness doctrine does not extend to one aspect of the Tribe's statutory argument:  the definition of "evaluation facilities."  In the period following Mira's hospitalization the legislature modified the statutory definition of "evaluation facility" so that it no longer includes "a medical facility licensed under AS 47.32" — the language that seemingly included both Sitka and North Star.[21]  Whether these facilities were "evaluation facilities" under an old version of the statute, and whether their status as "evaluation facilities" required the superior court to apply AS 47.30.700 et seq., are no longer issues that could recur in future cases.[22]  We decline to consider this moot issue.

B.     **The Civil Commitment Statutes Did Not Apply To Mira's Hospitalization.**

The parties disagree over the correct statutory framework governing OCS's authority to admit Mira to a hospital for inpatient psychiatric care.  In our recent decision in *Tuluksak Native Community v. Department of Health & Social Services*, we held that the superior court did not err by applying AS 47.10.087 to evaluate a child's admission to North Star, rejecting a different tribe's argument that that the admission

---

[20]     *See, e.g.*, *id.* (citing *Jennifer L. v. State, Dep't of Health & Soc. Servs.*, 357 P.3d 110, 114 (Alaska 2015); *Peter A. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 146 P.3d 991, 996 & n.30 (Alaska 2006)).

[21]     *See* Ch. 41 § 28, SLA 2002.

[22]     *Cf. Akpik v. State, Off. of Mgmt. & Budget*, 115 P.3d 532, 535 (Alaska 2005) (declining to apply the public interest exception to mootness where the relevant statutes had been changed).

was subject to the civil commitment statutes.[23] But the issues in that case were framed differently than they are in this case, so that decision does not control our analysis here.[24]

In this case the Tribe argues that OCS was required to petition for Mira's involuntary commitment under AS 47.30.700 and that the superior court erred by not applying the strict timelines and procedural safeguards of the commitment statutes to Mira's hospitalization. If those statutes applied, OCS would have had to petition for Mira's hospitalization when it took her to Sitka, and the superior court would have had to hold a hearing on whether Mira's hospitalization was justified within just a few days.[25]

OCS counters that it had authority by virtue of its legal custody under the CINA statutes to bring Mira to the hospital to receive psychiatric care. OCS takes the position that because it has this separate source of authority, it did not have to petition for Mira's involuntary commitment, and therefore was not subject to the procedures that apply to petitions for involuntary commitment. We agree with OCS's interpretation of the statutory framework.

---

[23]    530 P.3d 359, 368-69 (Alaska 2023).

[24]    For example, in *Tuluksak* the parties did not take the position that North Star is not a secure residential psychiatric treatment facility admission for purposes of AS 47.10.087.

[25]    AS 47.30.700 (authorizing "any adult" to petition for screening investigation and judicial determination within 48 whether "there is probable cause to believe the respondent is mentally ill and that condition causes the respondent to be gravely disabled or to present a likelihood of serious harm to self or others"); *see also* AS 47.30.705 (authorizing peace officer, mental health officer, or other medical professional to take person into custody for evaluation starting within 24 hours of arrival); AS 47.30.715 (setting forth procedures for evaluation facilities to conduct evaluations following receipt of evaluation orders, as well as procedures for court to set 30-day commitment hearing); AS 47.30.730 (establishing procedural and substantive requirements for petition for 30-day commitment).

OCS has the power to take a child to the hospital in a medical emergency. When a child is placed in OCS's custody, "a relationship of legal custody exists" that gives OCS authority and responsibility to make decisions about the child's welfare.[26] This authority includes, among other things, "the duty of providing the child with food, shelter, education, and medical care."[27]  In this way OCS stands largely in the shoes of the child's parent.  Like a parent, OCS can seek treatment for psychiatric emergencies.

Of course, OCS's authority is more limited than that of a parent.  OCS has the power to decide "where and with whom the child shall live,"[28] but a parent can ask the superior court to review OCS's decision.[29]  Although OCS has a duty to provide medical care to a child in its custody, the child's parent still retains the right to consent, or to withhold consent, to "major medical treatment."[30]  And though OCS may seek to place a child in a "secure residential psychiatric treatment facility," it must prove to the court by clear and convincing evidence that the child's condition is serious enough and that the treatment is likely to help the child or prevent the child's condition from getting worse.[31]

None of those limits on OCS authority applied in this case.  The Tribe and OCS agree that AS 47.10.087, which limits OCS's authority to place children at "secure residential psychiatric treatment centers," does not apply to Mira's hospitalizations

---

[26]  AS 47.10.084(a).

[27]  *Id.*

[28]  *Id.*

[29]  AS 47.10.080(s) (providing for judicial review of OCS decision to transfer child from one placement to another).

[30]  AS 47.10.084(c).

[31]  AS 47.10.087; *Tuluksak Native Cmty. v. State, Dep't of Health & Soc. Servs.*, 530 P.3d 359, 373 (Alaska 2023) (holding that a court's findings under AS 47.10.087 "must be made by clear and convincing evidence").

because neither Sitka nor North Star meets the definition for such a facility.[32]  Nor has any party argued that inpatient psychiatric hospitalization alone, without involuntary medication, is "major medical treatment" that requires parental consent under the CINA statutes.[33]  In short, nothing in the CINA statutes prohibited OCS from taking Mira to Sitka or North Star to receive inpatient psychiatric care.  Doing so was consistent with its "duty of providing the child with . . . medical care" required by AS 47.10.084.[34]

Although the Tribe argues that OCS cannot exercise this authority without invoking the civil commitment statutes, those statutes do not purport to limit OCS's legal custody and authority under AS 47.10.084.  The civil commitment statutes (with one exception we will address shortly) do not mention those with parental or other legal authority over others.  They do not mention children in state custody or reference AS 47.10 at all.  The civil commitment statutes create a legal mechanism for "any adult" — relative, colleague, neighbor — to have another person committed to a state-run or state-designated psychiatric hospital.[35]  When this mechanism is used, the attendant protections apply.  But OCS does not have to use this mechanism.  It has a separate basis of authority under the CINA statutes to seek emergency medical care, including

---

[32]    *See* AS 47.32.900 (defining "secure residential psychiatric treatment center" as "a secure or semi-secure facility, or an inpatient program in another facility, that provides, under the direction of a physician, psychiatric diagnostic, evaluation, and treatment services on a 24-hour-a-day basis to children with severe emotional or behavioral disorders").

[33]    *See* AS 47.10.084(b)-(c) (describing residual rights of parents of children in OCS custody, including "consenting to major medical treatment" and defining "major medical treatment" to include "administration of medication used to treat a mental health disorder"); *cf. Kiva O. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 408 P.3d 1181 (Alaska 2018) (establishing standard for overruling parent's unwillingness to give consent for involuntary medication of child in OCS custody).

[34]    AS 47.10.084(a).

[35]    AS 47.30.700.

psychiatric care, for the children in its custody. This authority is not expressly subject to the procedures in the civil commitment statutes.

The Tribe argues that the legislature could not have intended OCS to be exempt from oversight when admitting children in its custody to a psychiatric hospital. This argument rests largely on two statutes. First, the Tribe points to AS 47.10.087's judicial review process when OCS seeks to place children in secure residential psychiatric treatment facilities. The Tribe contends that it would be inconsistent with the legislature's protective intent to allow OCS to admit children to other, more acute psychiatric facilities without oversight. Second, the Tribe argues that under AS 47.30.690 the legislature has limited even parents' authority to admit their own children to a psychiatric hospital. Therefore, the Tribe argues, it would be absurd to interpret the law so that OCS has more authority to hospitalize a child than parents possess. The Tribe bolsters its argument under AS 47.30.690 by pointing to our decision in *In re April S.*, which held that OCS cannot rely on that statute to admit a child to a psychiatric hospital.[36] We stated in that case that OCS could instead petition for the child's involuntary commitment under AS 47.30.700.[37] The Tribe argues it would be inconsistent with *April S.* to hold that OCS was not required to petition for Mira's involuntary commitment to Sitka and North Star.

The problem with the Tribe's first argument is that we cannot interpret statutes to include things the legislature has failed to include.[38] Under AS 47.10.087, OCS's decision to place a child in a "secure residential psychiatric treatment facility"

---

[36] 499 P.3d 1011, 1019-20 (Alaska 2021).

[37] *Id.* at 1020.

[38] *See State v. Fyfe*, 370 P.3d 1092, 1100 (Alaska 2016) (explaining that we must assume "the legislature chose its words deliberately, avoided redundancies, and omitted words it intended to omit"); *State, Div. of Workers' Comp. v. Titan Enters., LLC*, 338 P.3d 316, 321 (Alaska 2014) ("We do not rewrite statutes even when the legislative history suggests that the legislature may have made a mistake in drafting.").

is subject to judicial review.[39] The superior court may permit this placement only if OCS proves by clear and convincing evidence that the severity of the child's condition warrants it.[40] This requirement does not apply to other classes of psychiatric facilities. The Tribe argues it would be absurd not to subject OCS's decision to admit a child in its custody to a psychiatric hospital (rather than a secure residential psychiatric treatment facility) to the same kind of judicial review. But the legislature could plausibly have intended to allow judicial review for long-term "residential placements" of youth in OCS custody but not for admission to a psychiatric hospital for acute care, which is often of much shorter duration.[41] More fundamentally, we as a court cannot rewrite the law to include what the legislature has omitted.[42]

The Tribe's second argument rests on a mistaken premise. The law does not limit parents' authority to admit children to all psychiatric hospitals, only to those designated by the State to hold people involuntarily. Under AS 47.30.690, a parent or guardian may sign a child into a "designated treatment facility" for psychiatric care if the child meets the criteria for admission, but the admission is limited to 30 days, and the child is assigned a GAL who can seek judicial review of the admission.[43] A "designated treatment facility" is defined as "a hospital, clinic, institution, center, or

---

**39** AS 47.10.087(a).

**40** *Tuluksak Native Cmty. v. State, Dep't of Health & Soc. Servs.*, 530 P.3d 359, 373 (Alaska 2023).

**41** See AS 47.10.087(b) (providing that court shall review placement at secure residential psychiatric treatment facility every 90 days).

**42** "The separation of powers doctrine 'prohibits this court from enacting legislation or redrafting defective statutes.'" *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1131 (Alaska 2017) (quoting *State v. Campbell*, 536 P.2d 105, 111 (Alaska 1975) (citing Alaska Const. art. II, § 1, & art. IV, § 1), *overruled on other grounds by Kimoktoak v. State*, 584 P.2d 25 (Alaska 1978)).

**43** AS 47.30.690(a)-(b).

other health care facility that has been *designated by the department* for the treatment or rehabilitation of mentally ill persons under AS 47.30.670 – 47.30.915."[44]

   In other words, a parent's authority to admit a child for psychiatric care at a state-designated facility is subject to the statutory restrictions detailed above. But the statute does not apply when a parent takes a child to a psychiatric hospital that is *not* designated for the purpose of involuntarily hospitalizing patients under AS 47.30.[45] Therefore a parent may admit their child to a non-designated psychiatric hospital for inpatient care free from the restrictions of AS 47.30.690. Because the legislature did not restrict parents' authority to admit their children to non-designated psychiatric facilities, the absurdity posited by the Tribe — parents being subject to more restrictions than OCS — does not exist.

---

[44] AS 47.30.915 (emphasis added).

[45] At first blush, it seems strange that the legislature would create procedures for judicial review when a parent admits a child to a psychiatric hospital but extend that protection only to some psychiatric hospitals. The Tribe argues this reading of AS 47.30.690 creates an absurd and glaring gap in the statute, undermining the apparent legislative goal of protecting children's liberty from their parents' decisions. But the Tribe may be misreading the underlying legislative policy of AS 47.30.690. Because the statute applies only to hospitalization at facilities designated by the State to involuntarily hold someone, it appears that the legislative purpose was not to restrict parents' ability to obtain medical care that they believe their children need. Instead the apparent purpose was to provide the due process that the U.S. Supreme Court held is constitutionally required when a state operates or designates a facility to restrain a minor's liberty at the direction of a parent. *See Parham v. J.R.*, 442 U.S. 584, 591, 600 (1979) (examining whether Georgia statute authorizing child's admission to state-run mental hospital at parent's behest so long as staff physician found child met admission criteria satisfied due process because "the state's involvement in the commitment decision constitutes state action under the Fourteenth Amendment"); *id.* at 633-34 (Brennan, J., concurring in part and dissenting in part) (maintaining that due process entitles child who objects to hospitalization to a "reasonably prompt" post-admission judicial hearing). For that reason, it is not absurd that the statute's protections apply only to facilities "designated by the department." AS 47.30.690; AS 47.30.915(7).

Neither Sitka nor North Star was a "designated treatment facility" at the time of Mira's admission, so the restrictions in AS 47.30.690 did not apply. The Tribe maintains that these facilities were designated. Its argument relies on a Department of Health Care Services regulation, 7 Alaska Administrative Code 12.215(d)(2), which provides that "[a] psychiatric hospital must have policies and procedures which require that it admit and discharge patients in accordance with AS 47.30." The Tribe argues that because a licensed psychiatric hospital (which includes North Star) must have policies and procedures that comply with AS 47.30, all such hospitals are "designated by the department for the treatment or rehabilitation of mentally ill persons under AS 47.30.670 – 47.30.915." This argument has two problems. First, undisputed evidence establishes that the State has not designated Sitka or North Star for this purpose.[46] Second, a different set of regulations expressly describes the process for designating treatment facilities for civil commitment purposes.[47] For example, 7 AAC 72.040 describes the Department's procedure for reviewing designation applications,[48] and 7 AAC 72.050 describes the reporting obligations that designated facilities incur.[49] Therefore the Tribe's argument that North Star and Sitka were "designated" by operation of 7 AAC 12.215 is unavailing.

Finally, the Tribe's reliance on *April S.* is unavailing too. That case presented a different question than the one currently before us. There the child was hospitalized at Alaska Psychiatric Institute (API),[50] a "designated treatment facility" for

---

**46** In the superior court the State presented an affidavit from a Department of Health Care Services official identifying Fairbanks Memorial Hospital, Bartlett Regional Hospital, Mat-Su Regional Health Center, and Alaska Psychiatric Institute (API) as the only designated treatment facilities in Alaska.

**47** 7 Alaska Administrative Code 72.012-.070.

**48** 7 AAC 72.040.

**49** 7 AAC 72.050.

**50** *In re Hospitalization of April S.*, 499 P.3d 1011, 1012-13 (Alaska 2021).

purposes of AS 47.30.690 because it is state-run.[51]  OCS argued that it was a "guardian" for purposes of AS 47.30.690, and therefore eligible to "voluntarily" admit a child to API under that statute's procedures.  Analyzing the statutory definition of the term "guardian" in the CINA and civil commitment statutes, we held that OCS was not the child's guardian and therefore could not admit the child to API without filing a petition for civil commitment.[52]  But we were not presented with the question of OCS's authority to admit a child to a hospital that is not a "designated treatment facility" for purposes of AS 47.30.690.[53]  The *April S.* decision focused on the narrow issue of whether OCS could use AS 47.30.690.  It did not resolve broader questions of OCS's authority to provide emergency medical care to children in its custody.

To summarize:  OCS has authority under AS 47.10.084 to seek emergency medical care, including acute psychiatric care, for children in its legal custody.  The civil commitment statutes under AS 47.30 create a separate authority for any person to petition to have another person admitted to a psychiatric hospital for evaluation and treatment, but these statutes do not expressly limit OCS's authority under AS 47.10. Although the legislature did limit OCS's authority to place a child in a secure residential psychiatric treatment facility, the statute contains no similar limitation on OCS's ability to admit a child to a psychiatric hospital for acute care, and the legislature could plausibly have intended that distinction.  And although the legislature restricted parents' ability to admit their children to psychiatric hospitals that have been designated by the State to involuntarily detain people, it did not restrict parents' authority to admit their children to other psychiatric hospitals.  There is nothing absurd about a statutory scheme that gives OCS the same authority as a parent when OCS has legal custody of a child,

---

[51]    AS 47.30.915(7).  The affidavit mentioned above, *supra* note 46, attests that API is a designated treatment facility.

[52]    *April S.*, 499 P.3d at 1019-20.

[53]    *Id.*

so we cannot assume the legislature meant to impose restrictions on OCS that it did not set forth in statute. For these reasons, we conclude that OCS was not required by statute to use the civil commitment procedures outlined in AS 47.30 to have Mira admitted to Sitka and North Star (which are not designated treatment facilities for purposes of civil commitment) for inpatient psychiatric care.

The Tribe's core concern that the statutory scheme has a gap in oversight is not unfounded. OCS candidly acknowledges that "the statutes contain what might be perceived as a gap because they restrict OCS's ability to admit a child to a 'designated treatment facility' under AS 47.30 or a 'secure residential psychiatric treatment center' under AS 47.10.087, but place no explicit restrictions for a non-designated acute psychiatric hospital like North Star that is neither of these things." It is this seeming gap that led the superior court to issue an injunction in the *Hooper Bay* case. The court ordered that, as a matter of procedural due process, OCS may not hold a child for longer than 30 days at North Star without "conducting an AS 47.10.087-type of hearing." That order is not before us on appeal, and we do not directly review it. But we agree with that court's conclusion that due process requires some kind of procedural oversight of OCS's decision to admit a child to a psychiatric hospital for a lengthy period of time. We address the requirements of procedural due process in more detail below.

Nevertheless, when interpreting statutes, we are bound to give effect to the legislative intent discerned from the text, legislative history, and underlying statutory purpose.[54] Those factors lead us to conclude that the legislature did not intend to restrict OCS from admitting a child in its custody to a psychiatric hospital that is not designated for purposes of involuntary hospitalization — either for specific policy

---

[54] *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 992 (Alaska 2019) (quoting *Alyeska Pipeline Serv. Co. v. DeShong*, 77 P.3d 1227, 1234 (Alaska 2003)).

reasons or because the legislature simply did not consider the scenario. Whether the statutory "gap" is due to intention or oversight, we have no authority to rewrite statutes.[55] The legislature is the branch of government with the authority to fill gaps in a statutory scheme.[56]

## C. Mira's Constitutional Rights Were Violated By The Lack Of Timely Notice And Hearing.

The Tribe argues that the superior court violated Mira's rights to equal protection, substantive due process, and procedural due process by permitting her prolonged hospitalization without a prompt hearing on whether the hospitalization was justified. The Tribe argues that the Alaska Constitution requires the courts to apply the civil commitment procedures (or their substantial equivalent) whenever OCS seeks inpatient psychiatric hospitalization for a child in its care. As threshold matters, we first determine that (1) the Tribe has standing to raise these constitutional arguments on Mira's behalf and (2) the Tribe's constitutional arguments must be reviewed for plain error because they were not adequately raised below.

### 1. The Tribe has standing to assert Mira's constitutional rights under the *parens patriae* doctrine.

The State concedes that the Tribe has standing to challenge the proper statutory framework for Mira's placement because it was a party to the CINA case. But

---

[55] *State, Div. of Workers' Comp. v. Titan Enters., LLC*, 338 P.3d 316, 321 (Alaska 2014).

[56] "The Alaska Constitution vests legislative power in the legislature; executive power in the governor; and judicial power in the supreme court, the superior court, and additional courts as established by the legislature. The separation of powers doctrine limits the authority of each branch to interfere in the powers that have been delegated to the other branches. The purposes of the separation of powers doctrine are to preclude the exercise of arbitrary power and to safeguard the independence of each branch of the government." *Alaska Pub. Int. Rsch. Grp. v. State*, 167 P.3d 27, 35 (Alaska 2007).

the State also points out that the Tribe's status as a CINA intervenor does not establish standing with respect to all issues.

"Standing is a 'rule of judicial self-restraint based on the principle that courts should not resolve abstract questions or issue advisory opinions.' "[57] Because we may not issue advisory opinions, we cannot allow a parent to raise constitutional arguments on behalf of a child in a CINA case absent a "persuasive showing of potential prejudice to [the parent]."[58]

However, the Tribe asserts that the *parens patriae* doctrine permits it to bring constitutional claims on Mira's behalf. [59] The *parens patriae* doctrine allows a sovereign "to bring suit to protect its interest in matters of public concern."[60] We distinguish sovereign, non-sovereign, and quasi-sovereign interests; only quasi-sovereign interests may form the basis for *parens patriae* claims.[61] "Sovereign interests include 'the exercise of sovereign power over individuals and entities within the relevant jurisdiction,' as well as 'the demand for recognition from other sovereigns.' "[62] "Non-sovereign interests include a [sovereign's] proprietary interests as well as the

---

[57]  *See Native Vill. of Chignik Lagoon v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 518 P.3d 708, 717 (Alaska 2022) (quoting *Keller v. French*, 205 P.3d 299, 302 (Alaska 2009)).

[58]  *R.J.M. v. State*, 946 P.2d 855, 871 (Alaska 1997).

[59]  In *Tuluksak Native Cmty. v. State, Dep't of Health & Soc. Servs.* we ruled that a tribe lacked standing to assert a minor's constitutional rights because that tribe failed to make any arguments establishing its standing.  530 P.3d 359, 380 (Alaska 2023).  But in this case the Tribe thoroughly explains its standing argument and presents an opportunity for this court to address the issue.

[60]  *State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs. v. Native Vill. of Curyung*, 151 P.3d 388, 399 (Alaska 2006) (citing *Georgia v. Pa. R. Co.*, 324 U.S. 439, 449-51 (1945)).

[61]  *Id.* (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 600-02 (1982)).

[62]  *Id.* (quoting *Snapp*, 458 U.S. at 601-02).

interests a [sovereign] protects when, acting as 'no more than a nominal party,' it seeks to protect the interests of private parties in court."[63]

Quasi-sovereign interests, which may form the basis for *parens patriae* actions, are a sovereign's interests in "the well-being of its populace."[64] A sovereign may not create a *parens patriae* claim by aggregating the claims of its citizens.[65] Rather, the sovereign must "articulate an injury to the well-being of the [sovereign] as a whole or to a sufficiently large segment of its population, and the overall injury must be more than the mere sum of its parts."[66] "[T]he fact that individual parties could have brought suit to vindicate their rights does not deprive a [sovereign] of *parens patriae* standing";[67] "[i]n such actions, the [sovereign] merely asserts that in addition to harming its citizens individually, the offending party has harmed the overall interests of the [sovereign]."[68]

In *State v. Native Village of Curyung*, the Native Village of Kwinhagak (and several other tribes) sought to enforce the rights of its children in OCS custody under the due process clauses of the federal and state constitutions.[69] We held that the Tribes' quasi-sovereign interests formed the basis for valid *parens patriae* claims because "the villages' interest in their children and in preserving their traditions through those children was 'inherently linked to the health, safety, and welfare of the Village's

---

[63]     *Id.* (quoting *Snapp*, 458 U.S. at 601-02).

[64]     *Id.* (quoting *Snapp*, 458 U.S. at 602).

[65]     *Id.*

[66]     *Id.*

[67]     *Id.* at 399-400 (citing *People v. Peter & John's Pump House, Inc.*, 914 F. Supp. 809, 813 (N.D.N.Y. 1996)).

[68]     *Id.* at 400.

[69]     *Id.* at 392.

members.' "[70]  Although OCS's actions directly impacted a relatively small number of children, we determined that "the well-being of individual families and children is inextricably bound up with the villages' ability to maintain their integrity, which is 'something that can only occur through the children of the Village.' "[71]

The same principle applies here.  Mira is not the only tribal child in OCS custody at risk of unnecessary or overly lengthy psychiatric hospitalization.  The Tribe has an undeniable quasi-sovereign interest in ensuring that its children are not needlessly institutionalized — a traumatic experience that may have long-term consequences for the child and her community.  The *parens patriae* doctrine gives the Tribe standing to assert constitutional claims on Mira's behalf.

### 2. We review the Tribe's constitutional arguments for plain error because it did not clearly raise these arguments in superior court.

The Tribe concedes that it did not raise Mira's equal protection rights before the superior court.  The parties agree that we should review the Tribe's equal protection argument for plain error.

But the Tribe maintains that it preserved its due process arguments by mentioning "due process" three times over the course of the continued hearings.  During the January 7 hearing, the Tribe criticized OCS for failing to provide updates on Mira's status and suggested that doing so "would ensure at least that the CINA proceedings would provide her with some level of support and due process."  This statement did not preserve the Tribe's argument on appeal that the due process clause of the Alaska Constitution required the court to apply the civil commitment statutes to review Mira's hospitalization.

---

**70**  *Id.* at 393 (approvingly quoting the superior court).

**71**  *Id*. at 402.

During the final hearing on January 18, the Tribe expressed frustration that OCS and North Star had sent referral applications to less restrictive environments only a week prior and had not asked Mira which residential facilities she would be willing to accept. The Tribe characterized OCS's unilateral decision to transfer Mira from Sitka to North Star as a failure to give Mira any "hope of due process, without . . . any sort of sense of advocacy on her behalf." The Tribe went on to ask the court to rule on whether the hearing would proceed under the AS 47.10.087 framework or the AS 47.30.700 et seq. procedures, stating that "[t]he civil commitment statutes require, at the very least, that a facility explore with the subject of the petition what they might be willing to engage in, not just because of due process rights, but because that's the way to actually get individuals healthy, to have them be willing to engage in a treatment program. [Mira] hasn't been given that opportunity to date."[72]

Although these statements suggest that the Tribe harbored due process concerns during the superior court hearings, they are not clear enough to preserve this argument for appeal. A "terse and undeveloped mention of due process in the superior court" does not preserve the argument for appeal.[73] In this case the Tribe's brief mention of due process failed to alert the superior court that the Tribe intended to present a constitutional challenge to the statutory scheme. We therefore review the Tribe's constitutional arguments for plain error. Plain error exists when there is an

---

[72] *See* AS 47.30.825(b) ("The patient . . . [is] entitled to participate in formulating the patient's individualized treatment plan and to participate in the evaluation process as much as possible, at minimum to the extent of requesting specific forms of therapy, inquiring why specific therapies are or are not included in the treatment program, and being informed as to the patient's present medical and psychological condition and prognosis . . . .").

[73] *Best v. Fairbanks North Star Borough*, 493 P.3d 868, 876 (Alaska 2021).

"obvious mistake"[74] that is "so prejudicial that failure to correct it will perpetuate a manifest injustice."[75]

### 3. The superior court did not plainly violate Mira's right to equal protection by declining to apply the civil commitment statutes to her hospitalization.

The Tribe did not raise an equal protection argument before the superior court, and the superior court did not issue an equal protection ruling. But the court did contemplate that foster children receive different treatment during involuntary hospitalization than children not in OCS custody. "I don't know why somebody in OCS custody would be entitled to less rights," the superior court stated, "but that's clearly what 47.10.087 does." The Tribe adopts this position on appeal, arguing that children in OCS custody are given fewer protections than children in their parents' custody. But this is not so. Under the statutory scheme described above, foster children in OCS custody receive no fewer protections than children in the custody of their parents.

The Alaska Constitution provides that "all persons are . . . entitled to equal rights, opportunities, and protection under the law."[76] This clause protects "those similarly situated from disparate treatment."[77] When assessing equal protection claims, we generally "decide which classes are to be compared and determine whether those classes are similarly situated or whether differences between the classes justify different treatment."[78]

---

[74] *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014).

[75] *Donahue v. Ledgends, Inc.*, 331 P.3d 342, 356 n.75 (Alaska 2014) (quoting *Forshee v. Forshee*, 145 P.3d 492, 500 n.36 (Alaska 2006)).

[76] Alaska Const. art. I, § 1.

[77] *Premera Blue Cross v. State, Dep't of Com., Cmty. & Econ. Dev., Div. of Ins.*, 171 P.3d 1110, 1121 (Alaska 2007).

[78] *State v. Schmidt*, 323 P.3d 647, 660 (Alaska 2014).

The Tribe's equal protection claim fails at the first step because there is no unequal treatment. The Tribe has not shown that children in OCS custody receive less protection than children in the custody of their parents. The Tribe's argument rests on the idea that when parents admit their child to Sitka or North Star, the protections of AS 47.30.690 apply. But these protections, which include limiting admission to 30 days and appointing a GAL to seek judicial review, do not apply in those scenarios because neither hospital is a "designated treatment facility" under AS 47.30.690 for the reasons explained above. Therefore the statute does not give children admitted to Sitka by their parents any more process than children admitted to that hospital by OCS. The same is true of admission to North Star.[79] Because the statutory scheme does not give children in OCS custody fewer rights than children in their parents' custody, the Tribe's equal protection claim fails.

### 4. Mira's extended stay at Sitka Community Hospital and North Star Hospital did not plainly violate her right to substantive due process.

Substantive due process " 'focuses on the result of governmental action, not its procedures,' meaning that it 'imposes limits on what a state may do regardless of what procedural protection is provided.' "[80] Under both the state and federal constitutions, substantive due process "requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."[81] The parties agree that the nature and duration of Mira's hospital stays should bear a reasonable relation to the purposes for which she was there. Because

---

[79] In fact, because of the *Hooper Bay* injunction, children in OCS custody who are admitted to North Star receive more procedural protection — an "AS 47.10.087-type of hearing" within 30 days of admission — than children whose parents admit them to North Star.

[80] *In re Hospitalization of Mabel B.*, 485 P.3d 1018, 1024 (Alaska 2021) (quoting 16C C.J.S. *Constitutional Law* § 1821 (2020)).

[81] *Id.* at 1025 (quoting *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)).

Mira's 18-day stay at Sitka and her 29-day stay at North Star had different purposes, we analyze them separately. We conclude that it was not plain error for the superior court to find no substantive due process violations in Mira's detentions at Sitka or North Star.

**Sitka.** Mira's foster parent brought her to Sitka for medical care after Mira consumed alcohol and prescription drugs. A clinician cleared Mira for discharge after a few hours of observation and stated that Mira did not need "24/7 supervision[,] just ongoing counseling and support." Yet Mira remained at Sitka for many more days, not because she was receiving care, but because OCS struggled to find another foster home for her.[82] During this time Mira "opened up about her past trauma" to a clinician at Sitka and experienced ataxia symptoms and a panic attack. These events caused the clinician to recommend acute psychiatric care, and Mira waited at Sitka for additional time before OCS transferred her to North Star.

Mira's experience bears some similarity to the facts of another case: *In re Hospitalization of Mabel B.* In that case we held that the State violated the substantive due process rights of two women who experienced lengthy detentions at the pre-evaluation stage of involuntary civil commitment procedures. Although judges had issued orders authorizing their "immediate delivery" to API for 72-hour evaluations, the women were detained at medical hospitals for more than two weeks before beds became available at API.[83] We held that the lack of capacity at API was an "insufficient justification" for detaining the women against their will: "[l]ack of funds, staff, or facilities cannot justify the State's failure to provide [such persons] with [the] treatment

---

[82] The record does not specify when the Sitka clinician changed her recommendation, although OCS apparently decided to transfer Mira to North Star by December 14.

[83] *In re Mabel B.*, 485 P.3d at 1026.

necessary for rehabilitation."[84]  Similarly, in this case OCS kept Mira at a hospital that was not adequate for her needs for more than two weeks, largely because it struggled to find a place for her to go.[85]

But gaps in the record lead us to conclude the superior court did not plainly err by failing to find a substantive due process violation.  There were three distinct purposes for Mira's stay at Sitka:  (1) acute medical treatment for an alcohol and drug overdose; (2) OCS's search for a new foster home; and (3) awaiting transfer to North Star for acute psychiatric care.  We know that Mira's emergency medical treatment at Sitka concluded within a few hours.  But the record does not tell us how long Mira waited at Sitka for a new foster home before it was determined she needed to go to North Star.  Because we do not know how long Mira waited for each reason, we cannot evaluate whether there was a reasonable relation between the length of Mira's stay at Sitka and her reasons for being there.  The lengths of time that Mira spent waiting for a new foster home and a transfer to North Star may have each been shorter than the unacceptable detention period in *Mabel B.*  And because there was no argument before the superior court on this matter, we lack the facts necessary to determine the length of time required for OCS to complete either task.

---

**84**      *Id.* at 1026, n.56 (quoting *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1121 (9th Cir. 2003)).  In another recent case we held that a four-day confinement before a 72-hour evaluation does not necessarily violate a detainee's substantive due process rights.  *In re Hospitalization of Vern H.*, 486 P.3d 1123, 1132 (Alaska 2021) ("Vern was held awaiting transport for approximately four days, and we see no substantive due process violation under the facts and circumstances of his detention.").

**85**      The record does not explicitly state that Mira objected to her detainment at Sitka.  But OCS did not promptly notify the parties of Mira's hospitalization and Mira did not have access to her own attorney who could have helped her express her desire to leave.  We therefore place no weight on Mira's failure to affirmatively object to her confinement.

OCS's poor communication with the parties is largely responsible for this gap in the record. But given the inadequate record, we cannot conclude that Mira's extended stay at Sitka was an "obvious" substantive due process violation.

**North Star.** In *Mabel B.* we ruled there was a substantive due process violation when two women were detained for weeks, receiving only limited preliminary treatment while awaiting evaluation at API.[86] By contrast, Mira did receive psychiatric care at North Star. Mira had the opportunity there to participate in individual and group therapy, although she sometimes refused this care. The civil commitment statues contemplate an initial stay of 30 days, which suggests that the Alaska legislature considers a stay of that length to be appropriate for psychiatric treatment.[87] Keeping Mira at North Star for 29 days was therefore reasonably related to the purpose of providing her with acute psychiatric care.

> **5. Mira's hospitalization for emergency psychiatric care for 46 days without timely notice and a hearing plainly violated her right to procedural due process.**

The Tribe argues that Mira's extended hospitalization without a hearing violated her right to procedural due process. Procedural due process "requires that adequate and fair procedures be employed when state action threatens protected life, liberty, or property interests."[88] Involuntarily confining an adult to a hospital "implicates Alaska's constitutional guarantees of individual liberty and privacy and therefore entitles [that person] to due process protections."[89] Mira's case requires us to

---

[86] *In re Mabel B.*, 485 P.3d at 1026.

[87] *See* AS 47.30.730(a) (permitting an initial commitment period of 30 days).

[88] *In re 2021 Redistricting Cases*, 528 P.3d 40, 58 (Alaska 2023) (quoting *Doe v. State, Dep't of Pub. Safety*, 444 P.3d 116, 124 (Alaska 2019)).

[89] *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 379 (Alaska 2007) (citing *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)), *overruled on other grounds by In*

determine what protections apply when OCS admits a child in its custody to the hospital for psychiatric care.

The U.S. Supreme Court considered similar issues in *Parham v. J.R.*[90] The Court held that Georgia laws authorizing parents to admit their children to a state-run mental hospital satisfied due process under the federal constitution, even though the statute did not provide for judicial review of the parents' decision.[91] The Court reasoned that "the risk of error inherent in the parental decision to have a child institutionalized for mental health care is sufficiently great that some kind of inquiry should be made by a 'neutral factfinder' to determine whether the statutory requirements for admission are satisfied."[92] It concluded that the Georgia system met this standard because it required a clinical team to make an informed diagnosis before admitting a child and because it provided for periodic review of the child's need for hospitalization by an independent medical group.[93] Particularly relevant to Mira's case, the Court reasoned that "the determination of what process is due varies somewhat when the state, rather than a natural parent, makes the request for a commitment."[94] It suggested, but did not decide, that "[i]t is possible that the procedures required in

---

*re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019); *see also id.* at 379 n.48 ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action. It is clear that commitment for any purpose constitutes a deprivation of liberty that requires due process protection." (quoting *Foucha*, 504 U.S. at 80)).

[90]     442 U.S. 584 (1979).

[91]     *Id.*

[92]     *Id.* at 606.

[93]     *Id.* at 614-16.

[94]     *Id.* at 617.

reviewing a ward's need for continuing care should be different from those used to review the need of a child with natural parents."[95]

The State argues that the procedural protections alluded to in *Parham* are satisfied by compliance with the *Hooper Bay* injunction, which requires an "AS 47.10.087-type hearing" within 30 days of a child's arrival at North Star. The Tribe emphasizes that Alaska's constitution is often more protective of liberty and privacy than the federal constitution.[96] Accordingly it argues that due process required OCS and the superior court to essentially apply the procedures contained in the civil commitment statutes to Mira's hospitalization.

To evaluate these procedural due process arguments, we use the *Mathews v. Eldridge* test,[97] which requires balancing three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[98]

Because the Alaska Constitution's guarantee of due process is more protective than that of the federal constitution, we are guided by, but not tethered to, the *Parham* decision.

---

[95]     *Id.* at 619.

[96]     *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 245 (Alaska 2006).

[97]     *Patrick v. Mun. of Anchorage, Anchorage Transp. Comm'n*, 305 P.3d 292, 299 (Alaska 2013) ("We look to the test set forth by the United States Supreme Court in *Mathews v. Eldridge* to determine the requirements of due process.").

[98]     *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976).

### a.    Private interest

We first consider the strength of minors' liberty interest in being free from forced hospitalization.[99]    For adults, involuntary hospitalization is "a 'massive curtailment of liberty' that cannot be accomplished without due process of law."[100] Adults therefore have "an interest in an accurate and expedited emergency evaluation and prompt judicial review of . . . emergency detention and evaluation."[101]

The U.S. Supreme Court held in *Parham* that "a child, in common with adults, has a substantial liberty interest in not being confined unnecessarily for medical treatment."[102]    It reasoned that unnecessary commitment may also produce "adverse social consequences for the child because of the reaction of some to the discovery that the child has received psychiatric care."[103]    The Court acknowledged that "[m]ost children, even in adolescence, simply are not able to make sound judgments concerning

---

[99]    In *In re Hospitalization of April S.* we cited an earlier decision, *In re Hospitalization of Daniel G.*, for the proposition that held that minors have a strong liberty interest.  499 P.3d 1011, 1017 (Alaska 2021) (citing *In re Daniel G.*, 320 P.3d 262, 271-72 (Alaska 2014)).  But our reliance on *Daniel G.* was mistaken:  the respondent in that case was not a minor, and his case did not specifically address the standards governing minors.  *See In re Daniel G.*, 320 P.3d at 264-65, 271-73 (evaluating respondent's procedural due process rights in the context of involuntary civil commitment procedures initiated by his father, rather than "voluntary" parental commitment procedures that would have applied under AS 47.30.690 had the respondent been a minor).  Therefore we consider the strength of a minor's liberty interest in this context as a matter of first impression.

[100]    *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007) (quoting *Humphrey v. Cady*, 405 U.S. 504, 509 (1972)).

[101]    *In re Daniel G.*, 320 P.3d at 272.

[102]    442 U.S. 584, 600 (1979) (citing *Addington v. Texas*, 441 U.S. 418, 425 (1979)).

[103]    *Id.*; *see also Wetherhorn*, 156 P.3d at 378 (explaining that the level of incapacity justifying an AS 47.30 civil commitment order "must be such so as to justify the social stigma that affects the social position and job prospects of persons who have been committed because of mental illness").

many decisions, including their need for medical care and treatment."[104]   But it concluded that a child "has a protectible interest not only in being free of unnecessary bodily restraints but also in not being labeled erroneously by some persons because of an improper decision" by a diagnosing clinician.[105]

The State points out that children do not have the same presumption of complete autonomy as adults, and that caregivers — whether parents or OCS — must protect children from errors in judgment.[106]  That is true, but minors' interest in bodily autonomy is still significant and entitled to great weight.  We agree with the State that caregivers are entitled to deference in caring for children, but our deference to parental authority does not wholly extend to the State.  "The rule in favor of deference to parental authority is designed to shield parental control of child rearing from state interference."[107]  Therefore "[t]he rule cannot be invoked . . . to immunize from review the decisions of state social workers."[108]  Parents have a special right to "direct the upbringing" of their children that warrants protection from judicial scrutiny.[109]  OCS does not have the same right.

---

[104]    *Parham*, 442 U.S. at 603; *see also Bellotti v. Baird*, 443 U.S. 622, 634 (1979) (listing "three reasons justifying the conclusion that the constitutional rights of children cannot be equated with those of adults:  the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing").

[105]    *Parham*, 442 U.S. at 601.

[106]    *See also id.* at 602 ("The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions.").

[107]    *Parham*, 442 U.S. 584 at 637 (Brennan, J., concurring in part and dissenting in part).

[108]    *Id.*

[109]    *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534-35 (1925).

### b. Risk of erroneous deprivation and value of additional procedural safeguards

It is important that all children, including those in OCS custody, receive the care that they need. But it is also important to protect children from being placed in a psychiatric hospital when they do not need to be. That kind of experience can cause harm too.

There is no doubt that children in OCS custody are at substantial risk of being hospitalized for longer than they need, or when they do not need to be hospitalized at all. Mira's case is an example. The lack of available foster homes meant that Mira was forced to stay at Sitka for well over a week after she had been cleared to leave. Because OCS caseworkers manage large caseloads, children are at risk of falling through the cracks, and the people who care about them are at risk of being left in the dark. The assigned caseworker was out of the office for part of the time that Mira was at Sitka. The parties to the case were notified of Mira's initial hospitalization ten days after it happened. They were told of the plan to transfer Mira to North Star only after she had been transferred, even though the decision to move her had apparently been made days earlier. And the assigned OCS caseworkers and North Star staff failed to apply to less restrictive facilities that would better serve Mira's needs until a few days before the superior court hearing — weeks after Mira was first hospitalized at North Star. Overall, Mira spent 46 days in a hospital, and the record indicates that for much of that time she was not in a setting that was appropriate for her needs.

The Tribe argues that when OCS seeks to hospitalize a child for psychiatric treatment, the constitution requires something akin to the protections contained in the civil commitment statutes. Under the civil commitment framework, OCS would first have to file a petition to have the child screened to determine if she should be taken to the hospital for evaluation,[110] or perhaps have a peace officer

---

[110] AS 47.30.700.

transport the child to a medical facility for evaluation.[111] The applicable statutes anticipate fairly immediate initiation and completion of the evaluation to determine whether the child meets the criteria for civil commitment.[112] A court hearing would have to be held within 72 hours of the child's arrival to determine whether the child should be hospitalized for treatment.[113]

Adopting these procedures would certainly protect more children in OCS custody from unnecessary hospitalization. But the key question is whether adopting these procedures would do more harm than good: in other words, whether such rigorous procedures would result in children *not* getting the psychiatric care they need in a timely manner. We must carefully weigh that risk to decide whether the Tribe's proposal to apply civil-commitment-like procedures to hospitalization of children in OCS custody strikes the right constitutional balance.

### c. The State's interest and the burden of more stringent procedures

OCS is entrusted with caring for some of the most vulnerable people in Alaska: children whose parents are unable to care for them. Many of these children have mental health needs as a result of traumatic events they have gone through. It is OCS's duty to get treatment for them.[114]

OCS argues that this duty would be frustrated by applying the civil commitment statutes to govern psychiatric hospitalization of the children in its custody. Although the civil commitment statutes can be applied to children, the typical

---

[111] AS 47.30.705(a).

[112] AS 47.30.710; AS 47.30.715.

[113] AS 47.30.725; AS 47.30.730; AS 47.30.735.

[114] AS 47.10.084(a).

respondent is an adult.[115]  As noted previously, adults enjoy a strong presumption of autonomy and are generally held responsible for their own welfare.[116]  Those societal values are reflected in the civil commitment statutes' stringent protections against involuntary hospitalization.[117]  OCS argues that the calculus should be different for children.  Children are generally not responsible for their own welfare, and they enjoy fewer freedoms than adults.[118]  Accordingly OCS argues that applying the civil commitment statutes would strike the wrong balance for children:  the extensive procedures would unduly delay or prevent OCS from getting children the care they need.  OCS maintains that the *Hooper Bay* injunction, which requires an "AS 47.10.087-type of hearing" within 30 days of a child's admission to North Star, strikes the right balance.

---

[115]  Because most minors are in the custody of a parent or guardian, it is usually not necessary to file a petition for involuntary commitment to admit a minor to a psychiatric hospital, even against the minor's will.  The "voluntary" admission process under AS 47.30.690 applies.

[116]  *See Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 247 n.61 (Alaska 2006) ("It is a firmly established principle of the common law of New York that every individual 'of adult years and sound mind has a right to determine what shall be done with his own body' and to control the course of his medical treatment." (citing *Rivers v. Katz*, 495 N.E.2d 337, 341 (N.Y. 1986))).

[117]  *See, e.g.*, AS 47.30.700(a) (requiring — upon petition by adult to have person involuntarily committed — immediate screening by judge or state-employed mental health professional, as well as issuance of ex parte order showing probable cause that respondent has mental health condition that makes respondent "gravely disabled or . . . present[s] a likelihood of serious harm to self or others" within 48 hours of completing such investigation); *see also* AS 47.30.707 ("[W]hen a crisis stabilization center admits a respondent under AS 47.30.705[] the crisis stabilization center may hold the respondent at the center for a period not to exceed 23 hours and 59 minutes.  A mental health professional shall examine the respondent within three hours after the respondent arrives at the center.").

[118]  *See Bellotti v. Baird*, 443 U.S. 622, 634 (1979).

It is important to note that the parties disagree only about procedure. They do not appear to disagree about the substantive standards for psychiatric hospitalization of minors. The civil commitment statutes favored by the Tribe and the standards from AS 47.10.087 incorporated in the *Hooper Bay* injunction both require the same proof by clear and convincing evidence: mental illness; grave disability or risk of harm to self or others; lack of less restrictive alternatives; and the possibility of improvement or the risk of deterioration without treatment.[119] Where the parties disagree is on the timing and procedural mechanisms applicable to the minor's hospitalization.

We conclude that the constitutionally required approach falls between the parties' positions. Although the civil commitment statutes are not the measure of what due process requires, the process that Mira received in this case fell below the constitutional line.

On the one hand, we agree with the State that the civil commitment statutes are not the right framework to govern admission of minors in OCS custody to a psychiatric hospital. Courts will struggle to hold a hearing to review a child's hospitalization within the time required by the civil commitment statutes. Unlike civil commitment cases, which involve only the petitioner and the respondent, CINA cases often involve many parties: the child, OCS, one or two parents, a GAL, and sometimes a tribe. Each of these parties is entitled to present evidence and be heard on the child's hospitalization.[120] Holding a meaningful hearing within the time required by the civil

---

[119] AS 47.10.087(a); AS 47.30.730(a); *Tuluksak Native Cmty. v. State, Dep't of Health & Soc. Servs.*, 530 P.3d 359, 373 (Alaska 2023). Under the civil commitment framework, the petitioner need only show the possibility of improvement if the respondent is alleged to be gravely disabled, not when the respondent is alleged to be a danger to self or others. AS 47.30.730(a).

[120] In these proceedings, most children will have their own attorney to advocate for the child's desires. CINA Rule 12.1(b) ("The court shall appoint an attorney for a child who is 10 years of age or older . . . [and] does not consent to placement in a psychiatric hospital or residential treatment center.").

commitment statutes will be challenging, as Mira's case shows. The superior court repeatedly rescheduled Mira's hearing in part to ensure that a key witness from North Star could attend. If witnesses and parties cannot be made to appear within the 72-hour period set in the civil commitment statutes, the respondent must be released from the hospital.[121] Although this strict result may be appropriate when the respondent is an adult, society's greater interest in providing care for minors demands a more flexible process.

On the other hand, we agree with the Tribe that the *Hooper Bay* injunction does not afford all the process that is due to minors in OCS custody. That order enjoins OCS "from holding any child under the care of OCS for longer than 30 days at North Star Hospital without conducting an AS 47.10.087-type of hearing." It does not cover other facilities. As a result, the injunction did not prevent OCS from keeping Mira at Sitka for over two weeks and then at North Star for almost 30 days before a hearing was held to determine whether her hospitalization was justified. When the State, acting as a child's custodian, seeks the child's admission to a hospital for psychiatric care, forty-six days is far too long for the child to be held without judicial review.

The *Hooper Bay* injunction is also silent on OCS's obligation to notify the child's parents, GAL, and tribe, if any. But the State must provide notice when it proposes to restrain a person's liberty.[122] We agree with the U.S. Supreme Court's decision in *Parham* that the court need not hold a hearing *before* the child can be

---

[121]  *See* AS 47.30.715 ("When an evaluation facility receives a proper order for evaluation, it shall accept the order and the respondent for an evaluation period not to exceed 72 hours."); *see also* AS 47.30.720 ("If at any time in the course of the 72-hour period the mental health professionals conducting the evaluation determine that the respondent does not meet the standards for commitment . . ., the respondent shall be discharged from the facility or the place of evaluation.").

[122]  *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 380 (Alaska 2007) (quoting *Huntley v. N.C. State Bd. of Educ.*, 493 F.2d 1016, 1019 (4th Cir. 1974)).

admitted to the hospital for psychiatric care.[123]  Society's interest in ensuring proper treatment for children's psychiatric emergencies permits OCS to first take the child to the hospital, then notify the child's parents and the other parties to the CINA case who have a role in advocating for the child's best interests, and then present evidence at a hearing to determine whether the hospitalization is justified.  But notice should be given at the earliest possible moment.  Requiring immediate notice places little burden on OCS and reduces the risk that a child will spend a long time in a psychiatric hospital when it is not the appropriate place for her.

In this case, OCS's failure to timely notify the parties of Mira's admission to the hospital worsened the deprivation of Mira's rights.  It delayed appointment of counsel to advocate for Mira.  It likely contributed to the ultimate delay in holding the hearing.  And it may have delayed the search for less restrictive treatment alternatives. Mira languished at North Star for over three weeks before OCS applied for her admission to less restrictive programs.  Unsurprisingly, she had not yet been admitted to any residential programs at the time of the hearing, so the superior court was forced to approve her continued stay at North Star because there were no less restrictive alternatives available at that moment.  The limited record in this case does not tell us why OCS waited over three weeks after Mira's arrival at North Star before it began submitting applications for less restrictive facilities.  Yet it stands to reason that notifying the parties earlier would have resulted in an earlier search for solutions.  The untimely notice and 46-day wait for a hearing violated Mira's right to due process.

Without a more developed record, we are unable to fully define the contours of the process Mira was due.  But we identify the following violations of

---

[123]  *Parham v. J.R.*, 442 U.S. 584 at 620-21 (1979) (holding that Georgia's "medical factfinding processes [were] reasonable and consistent with constitutional guarantees," when state's voluntary admission statutes did not require hearing before parent admitted child to psychiatric hospital).

Mira's procedural due process rights: (1) OCS's failure to immediately notify the parties to the CINA case that Mira was being held at Sitka for mental health reasons; (2) OCS's failure to immediately notify the parties that it had decided to admit her to North Star; and (3) the superior court's failure to hold a hearing before Mira's 46th day of continuous hospitalization. We conclude that the superior court's failure to hold an earlier hearing, at which time OCS's notice failures could have been recognized and corrected, was plain error.[124]

## V.   CONCLUSION

We REVERSE the superior court's order authorizing Mira's continued placement at North Star.

---

[124]   Because we reject the Tribe's argument that due process requires adherence to the civil commitment statutes, and because we hold that the 46-day period Mira went without a hearing did not satisfy due process, we need not decide whether the 30-day hearing deadline contained in *Hooper Bay* is constitutionally adequate. We observe only that the superior court set the 30-day deadline as an *outer limit* for holding a hearing, and that children's interests are best served by holding a hearing promptly after their admission to the hospital to confirm that the hospitalization is justified.